In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1182

KIMBERLY PASSANANTI,

*Plaintiff-Appellant,*

*v.*

COOK COUNTY, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cv-02803—**John W. Darrah**, *Judge.*

ARGUED MARCH 28, 2012—DECIDED JULY 20, 2012

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* The Day Reporting Center of the Cook County Sheriff's Department ran an intensive supervision program that provided services for non-violent pretrial defendants. Its program reduced overcrowding in the Cook County Jail and tried to integrate non-violent individuals into society through supervised employment, job training, and substance abuse treatment. Plaintiff Kimberly Passananti was the deputy

director of the DRC from 2002 until 2007. For several years, her supervisor was DRC director John Sullivan. After losing her job in 2007, Passananti sued, claiming that Sullivan subjected her to sexual harassment and that she was fired because of her sex. A jury agreed with her and awarded her a total of $4.1 million in damages: $4 million in compensatory damages against Cook County, and $70,000 in compensatory damages and $30,000 in punitive damages against Sullivan. The district court granted defendants' motion for judgment as a matter of law and entered judgment for the defendants. *Passananti v. County of Cook*, 2010 WL 3958645 (N.D. Ill. Oct. 7, 2010). Passananti appeals.

As the case comes to us, on review of a district court's decision to grant judgment as a matter of law despite a jury verdict in favor of Passananti, we must give her the benefit of conflicts in the evidence and reasonable inferences in her favor. We must assume: (a) that Sullivan repeatedly and angrily called Passananti a "bitch" to her face and in front of their co-workers; (b) that in 2005, he trumped up charges against her for violating a DRC policy against tampering with supervisees' urine samples; and (c) that he fabricated an accusation that she had had sexual relations with a supervisee. As a result of Sullivan's accusations, Passananti was temporarily transferred and ultimately sustained a five-day unpaid suspension. Sullivan left the DRC in July 2006. Passananti stayed on, but in 2007, she lost her job when her position as DRC deputy director was eliminated as part of county-wide budget cuts.

On Passananti's sexual harassment claim, we reverse the district court and reinstate the jury's verdict as to liability. The jury could reasonably treat the frequent and hostile use of the word "bitch" to be a gender-based epithet that contributed to a sexually hostile work environment. Passananti also presented sufficient evidence to allow the jury to find that the gender-based harassment she suffered was severe and pervasive, and that she did not unreasonably fail to take advantage of available corrective measures in her workplace. However, we affirm the district court's decision to set aside the jury's verdict on Passananti's discriminatory termination claim, which simply lacked any evidentiary support. As we explain below, there was considerable confusion in the district court's handling of the different claims and damage awards, but we can discern that the jury must have found that $70,000 was the proper amount of compensatory damages on the sexual harassment claim. The county is the proper defendant on that claim under Title VII of the Civil Rights Act of 1964. Punitive damages are not available against the county itself, so we remand for entry of judgment in favor of plaintiff and against the county for the sum of $70,000.

I. *Rule 50(b) Issues: Standard of Review and Timeliness*

Rule 50 of the Federal Rules of Civil Procedure allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed.

R. Civ. P. 50(a) (motion for judgment as a matter of law),
(b) (renewed motion for judgment as a matter of law). We
give a district court's grant of a Rule 50 motion rigorous
and *de novo* review. See *Schandelmeier-Bartels v. Chicago
Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011) (reversing
grant of Rule 50 motion). In deciding a Rule 50 motion,
the court construes the evidence strictly in favor of the
party who prevailed before the jury and examines the
evidence only to determine whether the jury's verdict
could reasonably be based on that evidence. See *Tart v.
Illinois Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004), citing
*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,
150-51 (2000). The court does not make credibility determi-
nations or weigh the evidence. See *Waite v. Board of
Trustees of Illinois Comm. College Dist. No. 508*, 408 F.3d 339,
343 (7th Cir. 2005), citing *Reeves*, 530 U.S. at 150. Although
the court reviews the entire record, the court "must
disregard all evidence favorable to the moving party
that the jury [was] not required to believe." *Reeves*,
530 U.S. at 151.

Before digging into the evidence and the merits, we
must address two procedural issues. Passananti argues
that the district court never should have heard the defen-
dants' renewed motion for judgment as a matter of law
under Rule 50(b) because (1) they failed first to file a
Rule 50(a) motion for judgment as a matter of law, and
(2) their Rule 50(b) motion was untimely. We disagree
on both points. Rule 50(b) states in relevant part:

> If the court does not grant a motion for judgment as
> a matter of law under Rule 50(a), the court is consid-

ered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment — or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged — the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

"Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." Fed. R. Civ. P. 50(b), comm. note (2006 amend.); see also *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404-05 (2006) (party forfeited argument not presented in a Rule 50(a) motion and not renewed in a Rule 50(b) motion).

The trial transcript contradicts the factual basis for Passananti's first argument. At the close of plaintiff's case, the defense orally moved under Rule 50(a) for judgment as a matter of law and presented some sort of writing to the court in support of that motion. The court reviewed the defense's written motion and then asked the plaintiff to respond orally, ultimately taking the motion under advisement. Tr. Vol. 3B at 36-41. Unfortunately, however, the defense's written motion discussed in the transcript was never actually entered in the court's docket or made part of the record.

We take this opportunity to remind district courts and their staffs that it is the district court's responsibility to ensure that such documents delivered to the clerk or to

the judge are made part of the court's file. See Fed. R. Civ. P. 5(d)(2), (4). District judges may depend on the help of the court clerks whom they supervise, but the responsibility remains the judge's, and here the transcript indicates that the document was actually in the judge's hands.

Like much that happened in this trial, however, this oversight was harmless. The defendants clearly made a motion under Rule 50(a) and submitted something on paper in support of it. In this appeal, the particulars of the defendants' Rule 50(a) motion are no longer relevant. It was not their Rule 50(a) motion that was granted, and Passananti does not argue that the defendants' Rule 50(b) motion, which was granted and is the subject of this appeal, was beyond the scope of their Rule 50(a) motion. Passananti also makes no attempt to show that she was prejudiced in any way by the district court's error in failing to docket an important trial document tendered to the court.[1]

---

[1] The district court also failed to gather for the record all of the exhibits admitted or offered as evidence at trial. In its order on the plaintiff's motion for reconsideration, the district court commented: "because neither party filed any trial exhibits on the docket, other than those submitted in connection with Defendants' motion for judgment as a matter of law, *it was difficult to determine whether the exhibit in question had been offered into evidence.*" *Passananti v. County of Cook*, 2011 WL 198131, at *4 (N.D. Ill. Jan. 18, 2011) (emphasis added). If no contemporary record is kept, it may be difficult for the trial

(continued...)

Plaintiff contends next that the defendants' Rule 50(b) motion was untimely. It was not. As applicable here, a Rule 50(b) motion must be filed "no later than 28 days after the entry of judgment." The district court did not enter judgment immediately after the verdict was returned, and in fact did not enter judgment until it ruled on the defendants' motion. The Rule 50(b) motion was therefore timely. Plaintiff takes the argument a step further, however. Relying on Rule 58, she argues that the district court committed reversible error by failing to enter judgment on the jury's verdict "promptly." If judgment had been entered promptly, the argument goes, defendants' Rule 50(b) motion would have been late. We put aside the ability of parties to rely on the district court's decision not to enter judgment immediately, for the argument still lacks merit. Rule 58 provides that the clerk of the court, without awaiting the court's direction, must promptly prepare, sign, and enter the judgment when a jury returns a general verdict, *unless the court orders otherwise*. Fed. R. Civ. P. 58(b)(1)(A). The jury reached its verdict in this matter on June 10. On June 22, the court

---

[1] (...continued)
court to determine after the fact whether a particular exhibit was offered into evidence, but it is nearly impossible to do so on appeal. We must again point out that it is the district court's responsibility to manage its own files and to ensure that the record is complete, including all motions, briefs, and evidence admitted or offered at trial. A district court is certainly entitled to call upon counsel to assist with this process, but the ultimate responsibility is the court's.

held a status conference and ordered the defense to file its Rule 50(b) motion by July 21. In other words, the court ordered otherwise.[2]

Plaintiff expresses concern that without a firm deadline, a judgment might never be entered or might be held hostage indefinitely, citing *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 846 (7th Cir. 1978) (addressing calculation of post-judgment interest). See also *Kiphart v. Saturn Corp.*, 251 F.3d 573, 587 (6th Cir. 2001) (expressing concern about six-month delay in entering judgment while Rule 50(b) motion was pending). We understand the plaintiff's concern, and Rule 58 makes prompt entry of judgment the norm. Nevertheless, district courts have ample discretion to manage their cases and to delay entry of judgment if there are sound reasons to do so. For example, if a verdict would impose a heavy financial burden on a defendant and a district court expects to set the verdict aside, it may be entirely appropriate to delay entry of judgment because of collateral consequences for the defendant's relationship with lenders and others. See, *e.g.*, *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 683 F. Supp. 680, 683-84 (S.D. Ind. 1988) (delaying entry of judgment on

---

[2] The briefing was delayed somewhat by plaintiff's motion for extension of time to file her response, which was extended until August 11. Although the plaintiff requested no further extension of time, her response was not filed until August 12. The same discretion the court exercised in extending time for the defendants to file their Rule 50(b) motion was also exercised in favor of the plaintiff in accepting her late filing.

antitrust verdict of more than $27 million while court considered and eventually granted defendant's motion for judgment as a matter of law), *aff'd*, 881 F.2d 1396 (7th Cir. 1989). This case gives us no occasion to consider the outer boundaries of this discretion. We see no abuse of discretion in the district court's decision to postpone entry of judgment for four months in this case while it considered and eventually granted the defendants' motion.

## II. *Passananti's Claims*

Having passed the procedural obstacles, we turn now to the merits of Passananti's substantive legal challenges to the district court's Rule 50(b) judgment as a matter of law. Passananti's complaint alleged claims of sex discrimination and sexual harassment under both Title VII and 42 U.S.C. § 1983. The complaint alleged that she suffered mistreatment at the hands of supervisor Sullivan and was terminated, and that these events amounted to sexual harassment and discrimination under Title VII and a denial of equal protection of the laws actionable under section 1983. It is not unusual for a plaintiff's claims to crystallize as litigation proceeds, and that's what happened in this case. In final trial preparations, Passananti stated her case as follows:

> The Plaintiff, KIMBERLY PASSANANTI, claims that she was subjected to gender discrimination and sexually harassing conduct by the Cook County Sheriff's Department and Director of the Day Reporting Unit, John Sullivan, and terminated in March, 2007

because of her gender. Mrs. Passananti asserts that the Defendants' conduct was in violation of Title VII of the Civil Rights Act of 1991 [sic] and in violation of the equal protection clause of the 14th Amendment to the U.S. Constitution.

Joint Statement of the Case, Dkt. 86.[3]

The law is well established that both Title VII and section 1983 could support both of plaintiff's claims, for sexual harassment and discriminatory termination. See, *e.g.*, *Valentine v. City of Chicago*, 452 F.3d 670 (7th Cir. 2006); *Bohen v. City of East Chicago*, 799 F.2d 1180, 1187-88 (7th Cir. 1986); see also *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1311-13 (11th Cir. 2001); *Moring v. Arkansas Dep't of Correction*, 243 F.3d 452, 455-56 (8th Cir. 2001); *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997) (collecting cases); *Lankford v. City of Hobart*, 27 F.3d 477, 480 (10th Cir. 1994). Both theories of liability support claims of sex discrimination, including termination based on sex, and sexual harassment is also a type of sex discrimination. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986).[4]

---

[3]  Passananti suggests that she also brought independent claims of discriminatory transfer and suspension. She has failed to develop those claims on appeal, however, and they are waived. See *United States v. Collins*, 604 F.3d 481, 487 n.2 (7th Cir. 2010).

[4]  That is not to say that Title VII and § 1983 claims are identical. For example, only persons "acting under color of law" may be

(continued...)

Despite this overlapping legal coverage of plaintiff's evidence, midway through trial, and unprompted by the defendants, the district court split Passananti's claims into one claim under Title VII and another under § 1983. On the afternoon of the second day of trial, this exchange occurred between the court and plaintiff's counsel:

> Court: And your theory of hostile work environment is, because these two women told the plaintiff about it, that created a hostile work environment. Is that your theory?
>
> Counsel: No, that's not my theory. My theory is that testimony goes to policy and practice.
>
> Court: And what does policy and practice go to? What count?
>
> Counsel: Count 3 I believe it is.
>
> Court: What is that count?

---

[4] (...continued)
sued under § 1983, while Title VII applies to all employers with more than 15 employees. Such differences are not material to Passananti's appeal, except for one. Title VII authorizes suit *only* against the employer. Individual people who are agents of the employer cannot be sued as employers under Title VII. Under § 1983, however, individuals may be liable. Compare *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995) (holding that supervisor may not held liable in his individual capacity for discrimination under Title VII), with *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("individuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts").

Counsel: It's 1983.

Court: And what are you pleading in 1983?

Counsel: Equal protection.

Court: In what regard? What was the gravamen of the denial of equal protection?

Counsel: Gender discrimination.

Court: In what specific regard?

Counsel: In terms of her reassigment . . .

Court: Her termination?

Counsel: Her termination.

Court. And this somehow goes to that?

Counsel: Yes. I think this goes to the . . . how that . . . how women were treated in that unit.

Court: But your theory is that she was discriminated against by being terminated.

Counsel: Yes.

Court: There's no relevancy here. I'm going to sustain the objection.

Tr. Vol. 2B, at 41-42. Based on this exchange, the district court held that Passananti had brought her sexual harassment claim under Title VII and had brought her discriminatory termination claim under § 1983. The issue in this exchange, though, was the relevance of one witness's testimony to Passananti's claims, not the legal framework of her claims. Nothing indicates that Passananti's counsel understood or should have under-

stood the import the district court later gave this dialogue. Nevertheless, Passananti did not object, and once the verdict was rendered, the parties followed the court's lead in their post-trial and appellate briefing. They treated Passananti's sexual harassment claim as having been brought only under Title VII and treated her discriminatory termination claim as having been brought only under § 1983. And, if the plaintiff has any sense of this error, she has not appealed it. In fact she maintains this construct on appeal. For this reason and no other, we follow the lead of the parties and the district court — though, in an attempt to provide a little clarity, we refer to Passananti's claims as her sexual harassment claim and her termination claim.

A. *Sexual Harassment Claim*

The following facts are drawn from the trial record and are taken in the light most favorable to Passananti, the non-moving party who won the jury verdict. Passananti began working for the Day Reporting Center of the Cook County Sheriff's Department in 1994 as an investigator. In 2002 she was promoted to deputy director of the DRC. As deputy director, Passananti was responsible for the day-to-day operations of the DRC. Around that same time, John Sullivan became director of the DRC and Passananti's immediate supervisor.

From 2003 until Sullivan left the DRC in 2006, Passananti testified, Sullivan's conduct toward her was "very demeaning, degrading and demoralizing." Specifically, he called her a "bitch" on "numerous occasions,"

over a "progressive period of time." Tr. Vol. 1 at 28. Sometimes he called her a "stupid bitch." Sullivan also treated other women in the DRC this way: an investigator in the DRC, Sally Guide-Campillo, testified that as she was leaving Passananti's office in April 2006, she heard Sullivan say to Passananti, "what is that fucking bitch doing in here this time?" Tr. Vol. 3A at 19-20. A month later, Guide-Campillo overheard Sullivan tell another supervisor, "you better instruct that F'n bitch to dress appropriately," regarding a female DRC employee. *Id.* at 23.

In August 2005, Sullivan called Passananti into his office and told her that he was going to open an investigation into "a violation." When Passananti told him that there was no violation, he started screaming at her and told her to "shut the 'F' up, you lying 'B'." He then informed Passananti that he was seeking her suspension for having sex with a DRC participant, an accusation that we must assume was a complete fabrication. Sullivan also accused Passananti and her subordinate investigators of releasing rather than re-incarcerating a DRC participant who had been caught tampering with his urine during a drug test. Prior to this incident, other "urine tampers" had been handled on a case-by-case basis and were considered to be minor infractions. Tr. Vol. 2A at 9. In Passananti's case, though, Sullivan forwarded his charges to the Sheriff's Department's internal affairs office, which was informed that the charges against her involved "tampering with drug samples for an inmate, and then improper conduct with an inmate in a [sexual] relationship." Tr. Vol. 3A at 53-

54. During the ensuing investigation, Passananti was transferred to a different department and given work as a secretary. She received and served a five-day suspension without pay, but she was later reinstated to her position as deputy director of the DRC. The male employees involved in the same incident were not transferred and were never disciplined. Tr. Vol. 2A at 12.

To protest the investigation, her transfer, and Sullivan's repeated and demeaning use of the word "bitch," Passananti wrote a ten-page letter to Dan Gallagher, special counsel to the Sheriff's Department. She alerted him to her belief that she was being targeted for discipline because she was a woman. Gallagher forwarded her letter to the Sheriff's Department's internal affairs office, but Passananti's complaint was not investigated. Sullivan permanently left the department in July 2006 for medical reasons. Passananti continued at the DRC until her termination in March 2007. She offered no evidence at trial that she suffered any sexual harassment between Sullivan's departure and her termination.

To prevail on her sexual harassment claim under Title VII, Passananti needed to show the following: (1) her work environment was both objectively and subjectively offensive; (2) the harassment she complained of was based on her sex; (3) the conduct was either severe or pervasive; and (4) there was a basis for employer liability. See *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009). To be actionable as sexual harassment, the unwelcome treatment need not be based on "unwelcome sexual advances, requests for sexual favors or other verbal

or physical conduct of a sexual nature." *Boumehdi v. Plastag Holdings, Inc.*, 489 F.3d 781, 788 (7th Cir. 2007), quoting *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004); see also *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998). Instead, words or conduct demonstrating "anti-female animus" can support a sexual harassment claim based on a hostile work environment. *Boumehdi*, 489 F.3d at 788. In other words, as the district court recognized, a plaintiff can proceed on a claim when the work environment is hostile because it is "sexist rather than sexual." *Id*.

### 1. *Hostile Work Environment Based on Sex*

The district court ruled that Passananti's sexual harassment claim failed because no rational jury could conclude that Sullivan's language and conduct were directed at Passananti because she was a woman. The district judge considered Sullivan's statements to be "vulgar, rude, and ungentlemanly," but, without additional proof, not sexist. *Passananti*, 2010 WL 3958645, at *8. "The mere fact that a defendant used a pejorative term that is more likely to be directed toward a female than a male does not alone establish unwelcome sexual conduct." *Id*., citing *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996), abrogated on other grounds, *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Our decision in *Galloway* provides some support for the district court's approach, for in that case, the plaintiff

complained about her treatment by a supervisor who repeatedly called her a "bitch" or "sick bitch," and we ultimately affirmed summary judgment for the employer on the plaintiff's sexual harassment claim. A close reading of *Galloway*, however, shows that the district court in this case properly allowed the jury to consider all the relevant circumstances and that the jury's verdict should be upheld. We concluded in *Galloway* that the harassment was based not on the plaintiff's sex but on personal animosity that arose out of an earlier "failed relationship" between the plaintiff and the harasser. 78 F.3d at 1168. We took care to limit the scope of our reasoning in *Galloway* regarding the use of the word "bitch": "We do not suggest, moreover, that the word 'bitch' can *never* figure in a sex discrimination case. When a word is ambiguous, context is everything." *Id.* (emphasis in original). The word "is sometimes used as a label for women who possess such 'women faults' as 'ill-temper, selfishness, malice cruelty, and spite,' and latterly as a label for women considered by some men to be too aggressive or careerist." *Id.* In other words, we recognized that such repeated use of the word "bitch" to demean a female employee could support a claim of sexual harassment if it was sufficiently pervasive or severe and if the context showed a hostility to the plaintiff because she was a woman.

This case is different from *Galloway* because there was no contextual evidence here that undermined the reasonable interpretation, that Sullivan's repeated and hostile use of "bitch" to address and demean Passananti was based on her sex. No additional proof was necessary

to allow a jury to find that Sullivan used the word "bitch" as a gender-specific term and that its impact was to degrade women in general and Passananti in particular. We respectfully disagree with the district court on this point.

We recognize that the use of the word "bitch" has become all too common in American society, and its use has permeated many workplaces. Common use, however, has not neutralized the word as a matter of law. The Eleventh Circuit sitting en banc issued a stern opinion on this issue, holding unequivocally that, "when a co-worker calls a female employee a 'bitch,' the word is gender-derogatory." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010) (en banc) (noting that both the original definition of the term — "the female of the dog" — and its secondary meanings — "a lewd or immoral woman" or a "malicious, spiteful, and domineering woman" — are gender-specific), citing Webster's Third New International Dictionary 222 (2002). Additional evidence that "bitch" is "sex based" for purposes of establishing gender-based harassment is not necessary.

*Reeves* is consistent with decisions in several other circuits. "A raft of case law . . . establishes that the use of sexually degrading, gender-specific epithets, such as 'slut,' 'cunt,' 'whore,' and 'bitch' . . . has been consistently held to constitute harassment based upon sex." *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 229-30 (1st Cir. 2007), citing *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000-01 (10th Cir. 1996) (finding it "beyond dispute" that plaintiff subjected to "vulgar and offensive epithets" such

as "whore," "bitch" and "curb side cunt" could establish Title VII sexual harassment claim even though abuse may have been motivated by gender-neutral reasons) (internal citations omitted); *Burns v. McGregor Elec. Indus.*, 989 F.2d 959, 964-65 (8th Cir. 1993) (reversing summary judgment and noting that "a female worker need not be propositioned, touched offensively, or harassed by sexual innuendo" to establish sexual harassment claim, and holding that terms such as "bitch," "slut," and "cunt" directed to female employee amounted to harassment based on her sex); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990) ("[T]he pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment."); but see *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 737 (8th Cir. 2000) (opinion of Beam, J.) ("mere use of the word 'bitch,' without other evidence of sex discrimination, is not particularly probative of a general misogynist attitude"), citing *Kriss v. Sprint Communications Co.*, 58 F.3d 1276, 1281 (8th Cir. 1995).

It is also true that the word "bitch" is sometimes directed not at women but at men. This usage, however, does not make the word gender-neutral. As the Eleventh Circuit explained:

> [E]ven accepting that Reeves's co-workers sometimes used the terms "bitch" and "whore" to refer to men, this usage may not make the epithets any the less offensive to women on account of gender. It is undeniable that the terms "bitch" and "whore" have

gender-specific meanings. Calling a man a "bitch" belittles him precisely because it belittles women. It implies that the male object of ridicule is a lesser man and feminine, and may not belong in the workplace. Indeed, it insults the man by comparing him to a woman, and, thereby, could be taken as humiliating to women as a group as well.

*Reeves*, 594 F.3d at 813.

We do not hold that use of the word "bitch" is harassment "because of sex" always and in every context, just as we did not hold that it never is in *Galloway*. Our precedents have made clear that the use of the word in the workplace must be be viewed in context. See *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007) ("[A] gender-specific term of abuse, such as 'son of a bitch,' need not imply hostility based on the abused person's sex any more than saying '*she* is a bad worker' need imply hostility based on her sex.") (emphasis in original) (internal citation omitted); *Galloway*, 78 F.3d at 1167-68 (rejecting an automatic inference from abuser's use of the word "bitch" that his abuse was motivated by victim's gender rather than by personal dislike). But we do reject the idea that a female plaintiff who has been subjected to repeated and hostile use of the word "bitch" must produce evidence beyond the word itself to allow a jury to infer that its use was derogatory towards women. The word is gender-specific, and it can reasonably be considered evidence of sexual harassment.

Whether its use is sufficient evidence of actionable sexual harassment is, of course, another matter. As with so

many other things, when gender-specific language is used in the workplace, these cases and others recognize that context is key. We must proceed with "[c]ommon sense, and an appropriate sensitivity" to that context to distinguish between general vulgarity and discriminatory conduct or language "which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale*, 523 U.S. at 82; see, *e.g.*, *Reeves*, 594 F.3d at 810 n.4 ("fucking" may strengthen an attack on women when used as an intensifying adjective before a gender-specific epithet such as "bitch," but when used alone the word "fall[s] more aptly under the rubric of general vulgarity that Title VII does not regulate").

In some instances, it will be apparent that although the language used is gender-specific, the impact of the words is neutral. But we could not say as a matter of law in this case that the impact of Sullivan's language was gender-neutral. The jury heard testimony that Sullivan used the word "bitch" regularly in reference to the plaintiff. He did not use the word in jest, but instead used it together with his threats against Passananti's employment. Keeping in mind our deference to the jury's verdict and plaintiff's evidence, we must assume that Sullivan trumped up a charge of a workplace rule violation to target Passananti (other, male employees were also charged, but only she was disciplined). Sullivan also falsely accused Passananti of having sex with a DRC participant, a charge for which she was also investigated. (In law enforcement and correctional work, there must be few accusations more damaging to an employee's reputation than to accuse her of having sex with an

inmate or supervisee.) In this context, it was error to treat Sullivan's repeated and hostile use of the word "bitch" as a matter of law as merely a "vulgar, rude, or ungentlemanly" workplace jibe. There was enough on this record for this jury to determine that when Sullivan called the plaintiff a "bitch," he was attacking her based on her sex.

The district court erred in removing this determination from the jury's hands and imposing its own finding. It was up to the jury to decide about context and credibility, such as what Sullivan's motivations were when he repeatedly targeted the plaintiff with vulgar, gender-based epithets, targeted her for discipline, and made and then followed through on his threat to accuse her of work-related sexual misconduct. The jury was instructed properly to assess this evidence and to determine whether it believed that Sullivan conducted his campaign against the plaintiff because of her gender. So instructed, the jury determined that Sullivan's conduct was sex-based and was not neutral. Ample evidence in the record supports its judgment. The district court's rationale for overturning the jury's verdict on this basis was error.

### 2.  *Severe or Pervasive*

It was not enough for the plaintiff to show only that she suffered mistreatment because of her gender. To rise to the level of an actionable hostile work environment, the complained-of conduct must have been sufficiently severe or pervasive to have altered the conditions of her

employment such that it created an abusive working environment. See *EEOC v. Management Hosp. of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012), citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Factors in this assessment include the severity of the allegedly discriminatory conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance. See *Gentry v. Export Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001), quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment. See *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998), citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). This assessment must be made from both subjective and objective viewpoints. See *Gentry*, 238 F.3d at 850, quoting *Faragher*, 524 U.S. at 787 (to be actionable, the plaintiff's work environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.") The district court determined that Sullivan's treatment of the plaintiff was not sufficiently severe or pervasive, and overturned the jury's verdict also on this basis. Here too, we find error.

There is no question that gender-based comments and epithets, when used pervasively in the workplace, can meet the standard for severe or pervasive harassment. In *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007), we reversed summary judgment for an employer based on the plaintiff's evidence that her super-

visor had made "at least eighteen sex-based comments" to her over the course of ten months, including "that women do not belong in the pressroom and think they know everything," as well as comments directed at the plaintiff based on how she should dress or how she was positioned. *Id*. at 786. We concluded that the supervisor's comments were both severe and pervasive enough to survive summary judgment. See *id*. at 789.

Our approach in *Boumehdi* is consistent with that of other circuits. See, *e.g.*, *Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 39-40 (1st Cir. 2011) (repeated comments of male supervisor and co-workers against plaintiff, a spinal neurosurgeon, were sufficiently severe to support jury award in favor of plaintiff on hostile work environment claim; plaintiff was asked to "get up on the table and dance" at a graduation dinner, was told that she was "really hot" and was asked to wear a belly-dancing outfit, and was repeatedly referred to as a "little girl" while her ability to perform surgery was questioned); *Aponte-Rivera v. DHL Solutions, (USA) Inc.*, 650 F.3d 803, 809 (1st Cir. 2011) (upholding jury verdict in favor of plaintiff on hostile work environment claim based on evidence that supervisors generally referred to women as "dumbies" and made several gender-based comments to plaintiff, including that women were supposed to do household chores, that the person running the company had to "have balls," and that the company had to be run by a man); *Harris v. Mayor and City Council of Baltimore*, 429 Fed. Appx. 195, 202 (4th Cir. 2011) (reversing summary judgment in favor of employer on plaintiff's hostile work environment claim;

plaintiff showed that harassment was sufficiently severe or pervasive based on evidence that workshop was decorated with pictures of nude and scantily clad women, and that women, including plaintiff, were regularly referred to as "bitches," "cunts," and "troublemakers"); *EEOC v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 328-30 (4th Cir. 2010) (supervisor targeted plaintiff with "highly personalized comments designed to demean and humiliate her" over the course of three years, including repeated comments about the size of plaintiff's breasts and supervisor's and supervisor's wife's genitals, that were sufficiently severe or pervasive to withstand summary judgment on plaintiff's hostile work environment claim).

In claims of racial harassment, racially-charged words certainly can suffice. See, *e.g., Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (although plaintiff failed to show that employer was negligent in discovering and remedying coworker harassment, his work environment, in which he was repeatedly subjected to the word "nigger" and other race-based comments, was sufficiently severe or pervasive to support an otherwise actionable hostile work environment claim); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675-76 (7th Cir. 1993) (finding an actionable hostile work environment when supervisors and employees referred to plaintiff by the term "nigger" between five and ten times during his employment). We see no reason to treat gender-based harassment claims any differently as a matter of law. Context matters, and it will often present a jury question.

The defendants do not contend that the jury was instructed improperly on this point (or any other). The jury, which was in the best position to judge witness credibility and demeanor, heard evidence that Sullivan called the plaintiff a "bitch" to her face nearly constantly for several years, from 2003 until 2006. Not only "bitch," but, perhaps for greater emphasis, a "lying bitch" and a "fucking bitch." See *Reeves*, 594 F.3d at 810 n.4 (otherwise gender-neutral profanity can intensify a gender-specific adjective and can be relevant to a sex harassment claim). Sullivan used this language against the plaintiff in front of her co-workers, tending to undermine her authority in the workplace. Moreover, Sullivan did not use this gender-charged word in isolation. He also accused Passananti of violating a department "urine tamper" rule and of having sex with a DRC participant. These accusations led to her temporary transfer and suspension. Applying proper instructions, the jury found that Sullivan's epithets and actions unreasonably interfered with the plaintiff's ability to do her job — after all, his behavior had a tangible impact. The evidence was sufficient evidence for the jury to find that Sullivan's conduct was so severe and/or pervasive as to have altered the conditions of her employment through an abusive working environment.

In support of the district court's judgment, the defendants argue that the plaintiff's working conditions could not have been subjectively so terrible after all because she did not submit an official departmental complaint form to internal affairs or to the Inspector General's office concerning Sullivan's harassment. The

defendants were entitled to make this argument to the
jury, and they did so, but the jury heard other evidence
that pointed in the opposite direction. The plaintiff
did indeed report Sullivan's conduct. As described
below, she wrote a detailed letter to the Sheriff's
special counsel. Her letter reached the Inspector
General's office, but there is no evidence that the
Sheriff's Department ever conducted an investigation
or followed up in any way on the plaintiff's com-
plaint. After Passananti complained once to no avail,
the jury easily could have found, as Passananti testified,
that further complaints would have been futile.
Moreover, there is other evidence in the record sup-
porting the jury's finding that the plaintiff felt sub-
jectively that Sullivan's treatment was hostile. The day
she was transferred out of the DRC, she became "hysteri-
cal," crying and yelling, and was unable to drive
herself home. The situation was "horrifying . . . just to
know that somebody had that much — had that much
power over you that no matter what you said, no
matter what the truth was, that it didn't matter. Nothing
mattered at that point except for where it was going
and how he was screaming at me." Passananti also
testified that she suffered from ongoing physical ail-
ments as a result of her treatment in the Sheriff's Depart-
ment, specifically depression, anxiety, insomnia and
stomach problems. Her condition was severe enough
that she sought medical treatment and was prescribed anti-
anxiety medication. From all of this evidence, the jury
easily could have concluded that the plaintiff found
her workplace subjectively hostile even if she did not
file another formal complaint.

3.   *Employer Liability and the Faragher-Ellerth Defense*

When no tangible employment action is taken against the employee in the course of the harassment, an employer may raise an affirmative defense to liability that must be proved by a preponderance of the evidence. See *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.*; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998). This defense attempts to strike a careful balance. It holds employers liable for certain specific misuses of supervisory authority while encouraging all parties involved to take appropriate steps to avoid harm. See *Faragher*, 524 U.S. at 805-07. The district court reversed the jury's verdict on sexual harassment also on the basis of this affirmative defense, finding as a matter of law that the defendants satisfied their burden of showing that they exercised reasonable care to prevent and correct sexual harassment, and that Passananti unreasonably failed to take advantage of available preventative or corrective opportunities. We disagree.

As an initial matter, we face a confused record as whether the defendants waived the affirmative defense and whether it was otherwise appropriate to instruct

the jury on the defense.[5] Although the defendants consistently denied the merits of Passananti's claims at every stage of the litigation, the only affirmative defense they raised in their answer was qualified immunity for defendant Sullivan. Less than five weeks before trial, the defendants tried to amend their answer to assert additional affirmative defenses, including the *Faragher-Ellerth* defense. The district court denied the late motion to amend (rightfully, in our opinion) on the grounds that the defense had failed to show that their untimely amendment was not the product of undue delay and that Passananti would not be unduly prejudiced by the

---

[5] This problem and others were at least facilitated if not caused by the hands-off approach the district court seemed to take regarding the jury instructions and verdict form. The court permitted the parties to draft these crucial documents, and it is not apparent from the available record on appeal that the district court played any role in the drafting process other than holding a very brief conference reviewing the parties' joint proposed instructions and directing counsel to modify the instructions in minor ways to conform to the court's earlier ruling and this court's pattern instructions. See Tr. Vol. 3B at 30-35. We recognize that busy district judges may prefer to let parties reach agreement on as many instructions as possible, especially in civil cases, where agreement can waive what would otherwise be reversible error. In this case, however, the end result was an agreed set of instructions and verdict form that were inconsistent and confusing. Many of these issues might have been avoided if the court had taken command of the instructions and taken responsibility for presenting a clear and coherent set of instructions to the jury.

amendment. Yet the parties jointly submitted agreed jury instructions that incorporated the affirmative defense, and the district court delivered the joint instruction containing the affirmative defense to the jury, contrary to its earlier ruling. Because Passananti cooperated in drafting the proposed instructions and did not object to the inclusion of the affirmative defense — waiving any argument she might have had regarding waiver — we proceed to a more troubling aspect of the defense, but one that was also waived and probably harmless in the end.

The Supreme Court has conditioned the availability of the *Faragher-Ellerth* defense on the absence of a tangible employment action. See *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 (2004); *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08; *Huff v. Sheahan*, 493 F.3d 893, 901 (7th Cir. 2008) (trial court committed reversible error by instructing jury on employer's affirmative defense without also instructing jury to decide whether employer's denial of case leads to plaintiff and denial of plaintiff's transfer were tangible employment actions, which would have barred the affirmative defense), citing *Jackson v. County of Racine*, 474 F.3d 493, 501 (7th Cir. 2007) (liability is "strict" when harassment by supervisor is accompanied by an official employment action such as discharge, demotion, or undesirable reassignment).

In this case, Passananti presented evidence that she was subject to tangible employment actions connected to Sullivan's harassment. She was transferred to a dif-

ferent department pending the investigation and was suspended for five days due to Sullivan's accusations that she had violated the "urine tamper" rule and had had sex with a DRC participant. The jury was not instructed to decide whether these employment actions were sufficiently tied to Sullivan's harassment so as to preclude the defendants' affirmative defense. This lapse could easily amount to reversible error, see *Huff*, 493 F.3d at 904-05, but here again, Passananti waived the issue for appeal. She failed to object to the instruction, failed to raise the issue in response to the defendants' Rule 50(b) motion, and failed to raise the issue in her opening brief on appeal.

The potential error turned out to be harmless. Even though the jury instructions seem to have erred in favor of the defense, the jury found that the defendants had not satisfied their burden. That finding is supported by sufficient evidence in the trial record. Accordingly, we reverse the district court's ruling on this issue.

The defendants built their *Ellerth-Faragher* defense on the Sheriff's General Order 3.7A and Passananti's familiarity with it. General Order 3.7A defined sexual harassment and outlined department procedures for handling complaints and investigations. The order also provided a formal complaint form for a complaining employee to give to her supervisor. (If the supervisor was the harasser, the complainant was to give the form to the next person in the chain of command.) The form was not detailed. It asked for basic information about the complainant and asked the complainant to "briefly

summarize the circumstances giving rise to your complaint, including who, what, when, where, time of incident and witnesses (Use additional sheet if necessary)." The supervisor receiving the report was to submit the complaint to the Inspector General's office through internal affairs. The Inspector General's office was responsible for reviewing the claim and conducting an investigation. Passananti was very familiar with General Order 3.7A and the Sheriff's sexual harassment policy. As part of her job, in fact, she taught the policy to new recruits. Yet to complain about Sullivan's conduct, Passananti did not fill out the form attached to General Order 3.7A. Her failure to comply with the policy she trained others to follow was the centerpiece of the defense. The tactic, though, proved to be a double-edged sword.

The jury heard evidence that undermined the defendants' reliance on Passananti's failure to follow the letter of the formal complaint procedure. The former director of internal affairs testified that employees could complain about sexual harassment in any number of ways, including going to their supervisor, their supervisor's supervisor, or directly to the Inspector General's office. Tr. Vol. 3A at 43-44. And, having been painted by the defense as an "expert" in General Order 3.7A, Passananti herself testified about the difference between the official department policy and the unofficial department practice in her actual experience:

> The policy says that this is what's going to happen: You are going to write a complaint, . . . an investigation

is going to be opened, we are going to do an investiga-
tion, we are going to question people, we are going
to be fair and open-minded, and we are going to
look at all the facts and we are going to make a deter-
mination. . . . The practice says if you put it in writing
and you make a complaint, you are going to be de-
moted, you are going to be punished, . . . you're going
to be in a lot of trouble.

Tr. Vol. 1 at 46-47.

Passananti backed up this testimony with details. In
2006, when she was discussing another employee's com-
plaint of sexual harassment with Sullivan, he told
her, "we can't have these allegations going on at Day
Reporting" and that "he just wanted this to go away."
Tr. Vol. 1 at 43, 45. Regarding a second complaining
employee, Sullivan told Passananti that the employee
needed to "quit putting things on F'g paper," and to
"quit putting documentation on paper and sending it
to the [Inspector General]." Tr. Vol. 1 at 47, 124. The jury
heard other evidence that supported Passananti's deci-
sion to use outside channels to complain. Jeanie Foster,
a DRC investigator, confirmed Passananti's belief. She
testified that she had followed the protocol for making
an internal complaint of sexual harassment pursuant
to General Order 3.7A, but the Sheriff's Department took
no action as a result. Tr. Vol. 2A at 47 (Q: "When you
employed the terms of the policy, was any action
taken?" A: "No.").

Instead of following the formal policy, Passananti
testified, she sent a detailed letter to the Sheriff's outside

counsel, who forwarded the complaint to the Inspector
General's office, where any sexual harassment com-
plaint was supposed to go. Passananti testified at trial
that she wrote her letter to the lawyer, Gallagher, and
did not complain internally using the official form
because she "knew that if it stayed internally, that it
would never have gotten anywhere, that . . . there's no
confidentiality. I felt that Mr. Gallagher would take
my best interests to heart and open up an investigation
or get it to the Sheriff so the Sheriff would open up an
investigation as to what was going on in the department."
Tr. Vol. 1 at 40.  She opened her ten-page letter, dated
August 17, 2005, by stating that she was "extremely well
versed" in sexual harassment matters, having previously
served as an expert witness in a federal sexual harass-
ment case on behalf of the Sheriff's Department. Gen-
erally, Passananti complained that she had:

> . . . first hand knowledge that people are doing things
> that are not in the best interest of my Sheriff and I
> have been privy to enough back door meetings to
> know that I am now the target of their aggression.
> The number one problem that they have is that I did
> not do anything wrong and all they had to do is give
> me the respect they would have given a man and
> ask me what happened.

Her letter described the circumstances — the "who, what,
when, where, time of incident and witnesses," to use the
language provided by General Order 3.7A — surrounding
her "unprecedented" transfer pending the investigation
into the "urine tamper incident." She framed her
detailed description of the urine tamper incident with

the fact that, at the time of her letter, she was one of four chiefs in the DRC under investigation for various misdeeds. The other three chiefs were male. She was the only woman, and the only one of the four to be transferred pending investigation. In other words, she complained of disparate treatment based on her gender. She told the lawyer that she raised the question of gender disparity to Sullivan upon being informed that she was being transferred, but Sullivan "had nothing further to say." She testified that she decided not to include in her letter that Sullivan also had falsely accused her of having sex with a DRC participant because she was "mortified" and, although she confronted Sullivan, did not want anyone else to hear Sullivan's false accusation. Tr. Vol. 1 at 89-90.

Regarding Sullivan's language towards her, Passananti described two incidents in her letter. She first recounted that on August 5, 2005, at approximately 11:30 in the morning, Sullivan called Passananti to his office, and, with the door open and in front of a number of witnesses, he "began screaming at [Passananti]." Her letter continued:

> He screamed "you are on dangerous ground again," and I asked "what?"

> He screamed "shut the Fuck up!" And began screaming that I let [Investigator] Acevedo get me in trouble again and I said "what are you talking about?"

> He screamed "I said shut up — you Lying Bitch."

> I asked him if he wanted to know the whole story and he said he didn't want to hear shit from me and walked out of the office.

Later, Passananti and Sullivan spoke again. She was "crying hysterically" and Sullivan apologized. He apologized again before she left work that evening. In a second incident, Sullivan and Passananti were discussing an office administrative matter. Passananti asked him if she should ask for a memo from one of the inspectors. Sullivan responded, "No, you're a broad, all of these people bullshit you."

Attorney Gallagher forwarded Passananti's letter to the Inspector General's office, so her informal written complaint landed in the same office that a formal complaint made pursuant to General Order 3.7A should have. Yet, contrary to the directives of General Order 3.7A, no investigation was ever opened. Passananti also brought another internal complaint. She complained orally to Carmalita Wagner, the executive director of the Sheriff's training academy. Tr. Vol. 1 at 37-38. Passananti told Wagner "everything that was going on." Wagner told her that Passananti needed to "take one" for the Sheriff, which Passananti interpreted as meaning that she needed to "shut up and take it."

In sum, the jury heard evidence that the Sheriff's Department had adopted an appropriate policy and complaint procedure, but that in reality the policy and procedure were ignored. The "mere creation of a sexual harassment policy will not shield a company from its responsibility to actively prevent sexual harassment in the workplace." *Gentry v. Export Packaging Co.*, 238 F.3d 842, 847 (7th Cir. 2001). The policy must provide "a meaningful process whereby an employee can express his or her concerns regarding an individual within a working envi-

ronment." *Id*. It is not enough that an anti-harassment policy appears reasonably effective on paper. The policy also must be reasonably effective in practice. See *Management Hospitality of Racine*, 666 F.3d at 435, citing *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 350 (6th Cir. 2005). The defendants did not satisfy their burden of showing the effectiveness of their formal policy. Thus, even assuming that it was proper to submit the defense to the jury, the jury could reasonably conclude that the anti-harassment policy was ineffective in practice and was not sufficient to meet the defendants' burden of proving their claimed affirmative defense. The jury also could reasonably find that Passananti acted quite reasonably in complaining through her letter to lawyer Gallagher, which reached the office that was responsible for investigating claims of sexual harassment.

At the end of the day, the critical question before the jury was whether the Sheriff's Department was put on notice of the misconduct, "not how the employer came to have that knowledge." *Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) ("The relevant inquiry is . . . whether the employee adequately alerted her employer to the harassment, . . . not whether she followed the letter of the reporting procedures set out in the employer's harassment policy."); see also *Phelan v. Cook County*, 463 F.3d 773, 786 (7th Cir. 2006) (finding that even though plaintiff did not follow the letter of the harassment policy, the defendant could not reasonably claim that it did not have sufficient notice of harassment under negligence standard). General Order 3.7A was not the only way an employee could raise a complaint of sexual harassment in the Sheriff's Department. The

defendants did not dispute that the Sheriff's Department learned of Passananti's complaint, which raised questions of gender discrimination and sexual harassment within the DRC. We do not need to decide here whether the jury could have found that the defendants had met their burden on the defense. The jury found that they had not, and that finding was supported by ample evidence. The district court erred by resolving both the question of sexual harassment and the affirmative defense in favor of defendants as a matter of law. The jury verdict on liability for the sexual harassment claim must be reinstated.

B.  *Termination Claim*

Passananti also appeals the judgment as a matter of law on her termination claim. Here again, we construe the evidence presented at trial strictly in her favor. At trial, Passananti had to present either direct or circumstantial evidence showing that she was terminated because of her gender. See *Runyon v. Applied Extrusion Technologies, Inc.*, 619 F.3d 735, 739 (7th Cir. 2010), citing *Greene v. Potter*, 557 F.3d 765, 769 n.1 (7th Cir. 2009). Even under the stringent standard of review that applies to judgments as a matter of law, we agree with the district court that she failed to support this claim. No reasonable jury could have concluded that plaintiff's gender played a role in her March 2007 termination.[6]

---

[6] Because we affirm the district court's judgment in favor of the defendants on Passananti's termination claim, we need not

(continued...)

Alexis Herrera was the chief financial officer for the Sheriff's Department. In 2007, she was assigned to prepare a budget that would reduce annual expenditures in the Department by about $5 million as part of a county-wide budget reduction, without requiring a reduction in the jail population. Herrera testified that she initially proposed to eliminate several community programs from the Sheriff's Department. If those proposals had been accepted, the budget reductions would not have affected personnel and Passananti would have kept her job. Tr. Vol. 2B at 73-75. In fact, at the outset of the process, the Sheriff's Department advocated full funding for all personnel, including Passananti's position.

When the first proposal was made public, however, there was an outcry. Hundreds of people appeared at public hearings to speak on behalf of the programs that were slated for elimination. Tr. Vol. 2B at 75. This pressure convinced Herrera's superiors to order her to come up with an amended proposal, one that made the needed cuts but retained funding for the community programs. *Id.* at 75-76. Herrera's revised budget proposed cuts to police officers, janitors, deputy sheriffs, and positions in the DRC — including Passananti's position. *Id.* at 76-79. Herrera's recommendation was ultimately approved by the Cook County Board, and Passananti received notice on March 3, 2007 that she was to be laid off.

---

[6] (...continued)
address the defendants' argument that Passananti failed to satisfy her burden of proving *Monell* liability against the municipal defendants to prevail under § 1983.

There is simply no evidence that the budget decision was based on Passananti's gender. When the decision to eliminate her position was being made, Sullivan was no longer employed in the DRC. He had gone on medical leave in July 2006 and never returned to work. There is no link in the evidence between Sullivan's abusive treatment of Passananti and her later termination. Herrera testified that she was forbidden from talking with the departments about the proposed layoffs. She offered unrebutted testimony that she was not directed by anyone from the Sheriff's Department to eliminate Passananti's position, and she did not have figures about gender or race, or a list of employee names in front of her when she was making the recommendations. No evidence suggests that Herrera was aware that Passananti held one of the positions she was recommending for termination. See *id.* at 79.

Passananti argues that the jury was entitled to disbelieve Herrera's testimony, that she she was singled out for termination, and that she was the only person whose job was eliminated in Herrera's budget proposal. According to plaintiff's theory, the other positions Herrera cut were actually unstaffed and the budget cuts were a smokescreen to cover up the true motivation of the Sheriff's Department to cut the budget in 2007 — Passananti's gender. This is an attempt to substitute speculation for evidence. Sullivan was gone, and Passananti does not claim or offer evidence that anyone else in the department harbored any gender-based animus toward her. Herrera testified without contradiction that she made the decision to cut

Passananti's position and did so unilaterally, without input from anyone else in the Sheriff's Department. Passananti attempts to argue that the other positions that were eliminated were not actually staffed, but the testimony she cites does not support her contention. See Tr. Vol. 2B at 88.

Passananti also relies on "Exhibit 2" to support her theory that Herrera's testimony was false and that the 2007 budget cuts were actually a cover-up for illegal gender discrimination. Passananti argues that Exhibit 2 showed that the number of full-time equivalent positions in the Sheriff's Department as a whole rose from 6,856.6 to 6,874.3 in 2007, and that overall appropriations also rose from $337,998,421 to $338,129,452. See Pl. Br. 19-20, citing App. Ex. H.

Given the muddled state of the record, it is not at all clear that Exhibit 2 was even admitted.[7] Even if it was, those bare figures are meaningless without explanatory testimony, and Passananti presented no testimony explaining these figures or this exhibit. The exhibit is over one hundred pages long. For it to have influenced the verdict as plaintiff argues, jurors would have had to find two lines of text on one of those pages during the trial without any testimony to guide them. Even if the jurors had managed to find those two lines of text,

---

[7] The district court did not seem to believe that Exhibit 2 had been admitted, and it refused to provide the exhibit to the jury during its deliberations. *Passananti*, 2011 WL 198131, at *4-5. Passananti has not challenged this ruling on appeal.

Passananti also fails to explain how it would have been possible for them to draw any conclusion one way or the other regarding the decision to cut funding for her position in the DRC. The figures in Exhibit 2 on which Passananti relies relate to the entire Sheriff's Department, not to the DRC, let alone to Passananti. In short, if Exhibit 2 was the key to showing discriminatory termination, the jury was not given the evidence it would have needed to reach that conclusion. Without any evidence from which a reasonable jury could have concluded that her termination was motivated by her gender, Passananti's termination claim must fail. We affirm the district court's grant of the defendants' Rule 50(b) motion on the termination claim.

III. *Damages*

Because we reinstate the verdict in favor of Passananti on her sexual harassment claim, but affirm the district judge's decision for defendants on her termination claim, we must address the jury's damage awards. The jury found in favor of Passananti and against all defendants on each of her claims, awarding her $4 million in compensatory damages against the Cook County Sheriff and $70,000 in compensatory damages and $30,000 in punitive damages against Sullivan. The defendants raised no challenge to the damage award in post-trial briefing, aiming only at the issue of liability, and neither party has argued on appeal that the damages award should be remanded to the district court. Because of the inexact wording of the verdict form and some confusion

in the district court about lining up the right defendant with the right legal theory, we might ordinarily have to order a new trial limited to the issue of damages for the sexual harassment claim. As it happens, though, the jury verdict here allows us to do a bit of reverse engineering to avoid the need for a new trial and leave in place as much as possible of the jury's work.

Passananti was claiming two distinct injuries: the injury from the sexual harassment she suffered while she was still working, and the injury she suffered from her later (and unrelated) termination. The best course in a case claiming more than one distinct injury from different conduct is usually to ask the jury to determine liability first and then to determine the amount, if any, that should be awarded for each distinct injury. Finally, the jury should be asked any needed questions about allocating responsibility among multiple defendants. See generally *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 312-13 (7th Cir. 2010); *id*. at 315-16 (Sykes, J., dissenting from denial of rehearing en banc). That did not happen in this case, but the failure to do so was harmless in the end. All the evidence that Passananti offered on her sexual harassment claim points to Sullivan as the perpetrator. She did not offer any evidence suggesting that any other individual in the Sheriff's Department was harassing her. Having failed to prevail on its affirmative defense, the Sheriff's Department is vicariously liable for Sullivan's harassing conduct under Title VII. See *Management Hosp. of Racine*, 666 F.3d at 434. No evidence connected Sullivan to Passananti's termination, which occurred months after

he left the department. Even though the jury concluded wrongly that Passananti's termination was discriminatory, the jury verdicts against Sullivan provide the jury's measure of the injury she suffered from the sexual harassment.

The verdict as to liability for sexual harassment stands, but Passananti's sexual harassment claim was treated, without objection, as a Title VII claim. Sullivan cannot be held individually liable under Title VII. See *Williams*, 72 F.3d at 555 (holding that supervisor may not be held liable in his individual capacity for discrimination under Title VII). Thus, the compensatory damage award and punitive damage award against Sullivan for sexual harassment must be reversed. As Passananti's employer, the Sheriff's Department can be held liable for Sullivan's harassment under Title VII, but it cannot be held liable for punitive damages. See 42 U.S.C. § 1981a(b)(1) (providing that a Title VII complainant may recover punitive damages "against a respondent (other than a government, government agency or political subdivision)"). Using the jury's award of compensatory damages against Sullivan as the measure of actual damages, we remand with instructions to award that amount ($70,000) to Passananti against the Sheriff's Department.

*Conclusion*

To sum up, we reverse the district court's grant of the defendants' motion for judgment as a matter of law and reinstate the jury verdict in favor of Passananti on

her sexual harassment claim. We affirm the district court's grant of the defendants' motion for judgment as a matter of law on Passananti's termination claim. We remand with instructions to enter judgment in favor of Passananti in the amount of $70,000 in compensatory damages against the Cook County Sheriff's Department. The judgment is affirmed to the extent it was in favor of Sullivan in his individual capacity. On remand, Passananti may seek a reasonable attorney fee and costs from the Sheriff's Department.