# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3567

GREGORY M. SHEPARD and
AMERICAN UNION INSURANCE COMPANY,

*Plaintiffs-Appellants*,

*v.*

STATE AUTOMOBILE MUTUAL INSURANCE
COMPANY and STATE AUTO FINANCIAL CORPORATION,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 01-C-1103—**David F. Hamilton**, *Judge*.

ARGUED APRIL 11, 2006—DECIDED SEPTEMBER 14, 2006

Before FLAUM, *Chief Judge*, and WILLIAMS and SYKES, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. The plaintiffs-appellants sued the defendants, claiming that the defendants breached a confidentiality agreement by relying upon the plaintiffs' confidential disclosures to acquire Meridian Insurance Group, Inc. Because the plaintiffs cannot establish either causation or damages, we affirm the district court's grant of summary judgment to the defendants.

## I. BACKGROUND

This case centers around the efforts of plaintiff-appellant Gregory Shepard and the defendants to acquire Meridian Insurance Group, Inc. and its affiliated companies (collectively, "Meridian"). Shepard is chairman and president of co-plaintiff-appellant American Union Insurance Company, a company which has been in his family for three generations and which Shepard now essentially owns. He was the largest shareholder (20.26% shareholder) in rival Meridian, and, after several failed courtship attempts directly with Meridian, Shepard approached another rival, the defendants-appellees, State Automobile Mutual Insurance Company and State Auto Financial Corporation (collectively, "State Auto"), to discuss a joint effort to acquire Meridian, perhaps by hostile takeover. Like Shepard, State Auto had been attempting to purchase Meridian for several years and, unbeknownst to Shepard, was in the midst of a new round of negotiations with Meridian when Shepard approached State Auto with his business proposal.

On September 27, 2000, Shepard spoke with State Auto's Chairman and CEO, Bob Bailey, and proposed a meeting to discuss a potential joint effort to acquire Meridian. That same day (or shortly thereafter), Bailey signed a confidentiality agreement that prevented State Auto (and its officers) from disclosing any non-public information discussed during the meeting or trading any securities in Meridian as a result of any information disclosed to State Auto during the meeting.

On October 2, 2000, Shepard and Bailey, and various other officers and attorneys from both companies, met at State Auto for approximately two hours. During this meeting, Shepard presented three exhibits that illustrated his proposed valuation of Meridian and included some strategic issues to consider in the purchase of Merid-

ian, including, among other things, certain concerns regarding the correct pricing of Meridian's stock options (issues that State Auto's Chief Financial Officer (CFO) apparently had failed to consider). Several of Shepard's analyses contained significant mathematic and analytic errors, including a $114 million double-counting error. At the end of the meeting, Bailey informed Shepard that he would not go along with Shepard's proposal and the two parted ways.

According to Shepard, although State Auto refused his business offer, it nonetheless impermissibly relied upon his analyses and suggestions in a subsequent meeting with Meridian, where the State Auto-Meridian merger was consummated. On October 5, 2000, just three days after the confidential meeting with Shepard, State Auto's CFO revised his financial analysis pertaining to the potential Meridian acquisition. State Auto's analyses now included—for the first time—certain financial information that had been presented by Shepard at the confidential meeting, including the proper consideration and valuation of outstanding Meridian stock options. The next day, on October 6, 2000, Bailey met with Meridian's CEO and CFO to discuss State Auto's proposed purchase of Meridian. Meridian's CEO, Norma Oman, testified that Bailey informed her at the very outset of the meeting that he had just had confidential discussions with Shepard, although both Bailey and Oman contend that the substance of those discussions was not revealed by Bailey. Oman also testified that Bailey had told her that Shepard was "aware of every element of the September 7th letter" that Bailey had written to Oman. This letter outlined an initial offer and stated that Shepard "expected to be paid more than other shareholders." In addition, Oman's notes from the meeting with Bailey included several references to Shepard, including such entries as "Shepard mtg on 10/2 with Bailey" and "will have litigation from Shepard."

By the end of this meeting, Bailey and Oman agreed to the key terms of State Auto's acquisition of Meridian. The deal was announced publicly approximately two-and-a-half weeks later, on October 25, 2000. State Auto's acquisition of Meridian required Shepard (along with all other public shareholders) to tender his shares to the new corporation in exchange for a $30 per share price. At the time of the transaction, Shepard owned approximately 1.5 million shares. The Meridian acquisition closed on May 31, 2001.

Shepard sued State Auto, alleging that it had breached their confidentiality agreement both by revealing protected confidential information to Meridian personnel and trading in Meridian stock as a result of such confidential information. The district court granted the defendants' motion for summary judgment, holding that Shepard could not establish any of the elements of his breach of contract action. Shepard now appeals.

## II. ANALYSIS

Shepard's claims fail because the undisputed facts show that he cannot establish either causation or damages as a matter of law. Under Indiana law (which controls in this diversity action), causation is an essential element of liability in a breach of contract claim. *Parke State Bank v. Akers*, 659 N.E.2d 1031, 1035 (Ind. 1995). "As in tort law, so in contract law, causation is an essential element of liability." *Wisc. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1289 (7th Cir. 1986). Thus, a plaintiff must prove that the alleged breach of contract was a cause in fact of his loss, which requires a showing that the breach was a "substantial factor" in bringing about the plaintiff's damages. *See generally Lincoln Nat'l Life Ins. Co. v. NCR Corp.*, 772 F.2d 315, 320 (7th Cir. 1985). Although causation is normally a question of fact for the jury, *see INS Investigations Bureau v. Lee,* 784 N.E.2d 566, 575 (Ind. Ct. App. 2003), summary

judgment is appropriate when the undisputed facts establish that a plaintiff cannot show the requisite causation as a matter of law. *See Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1996) (affirming summary judgment because the plaintiff could not establish the "critical element of causation"); *Harris v. Owens-Corning Fiberglas Corp.*, 102 F.3d 1429, 1433 (7th Cir. 1996) (same).

Under Indiana law, a plaintiff carries the burden to plead and prove damages. *Lincoln Nat'l Life Ins. Co.,* 772 F.2d at 320. Importantly, "[a] mere showing of a breach of contract does not necessarily entitle a plaintiff to damages." *Id.* Instead, a plaintiff is limited to recovering only the losses actually suffered from the breach, and an injured party may not be placed in a better position than he would have enjoyed if the breach had not occurred. *Fowler v. Campbell*, 612 N.E.2d 596, 603 (Ind. Ct. App. 1993). Moreover, damages cannot be based on mere speculation and conjecture. Rather, a plaintiff must have adequate evidence to allow a jury to determine with sufficient certainty that damages in fact occurred, and, if so, to quantify such damages with some degree of precision. *See id.; Turbines v. Thompson*, 684 N.E.2d 254, 258 (Ind. Ct. App. 1997)*; Fowler*, 612 N.E.2d at 603. Thus, "[a] damage award must be referenced to some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits or direct inference from known circumstances." *Fowler*, 612 N.E.2d at 603.

Although the parties separate the issues of causation and damages, these two issues are inextricably linked in this case. *See Wisc. Knife Works*, 781 F.2d at 1289 (noting that the arguments that a party "sustained no damage from the alleged breach of contract" or that "the alleged breach was not causally related to that damage" amount to "the same thing"). That is, they both boil down to the predicate issue of whether Shepard can present sufficient evidence to establish that State Auto's purported misuse of his pro-

tected disclosures[1] was a substantial factor in Shepard receiving what he contends to be the inadequate consideration of $30 per share cash-out. In the district court, Shepard advanced two theories of causation and damages. First, he advanced a "lost business opportunity" theory, in which he claimed State Auto's breach precluded him from purchasing Meridian directly. He wisely abandoned that theory on appeal in light of the undisputed evidence that Meridian's Board of Directors had an unmitigated dislike of Shepard and, as a result, was extremely unlikely to have approved any tender offer by him. In fact, the board had rejected his two prior offers: an August 30, 2000 initial offer of $20 per share (rejected on September 8, 2000), and then an amended offer on September 18, 2000 of $27 per share (rejected on September 21, 2000), both of which directly preceded State Auto's $30 per share offer. Shepard's second theory rests on the contention that Meridian shares were worth as much as $45 per share and therefore Shepard's forced cash-out at $30 per share was a substantial loss. Shepard owned approximately 1.5 million shares, which would translate to a loss approximating $22 million—and we use the term "loss" loosely here, as there is no dispute that Shepard profited handsomely from the $30 per share price; the sole issue is whether he was entitled to even great profit.

Under Shepard's theory, State Auto relied upon his confidential disclosures pertaining to both the "true" value of Meridian and his purported bidding strategy to alter materially its subsequent offer to acquire Meridian. Specifi-

---

[1] The district court determined that Shepard's disclosures were not protected because they were either misrepresentations, inaccuracies, or information in the public domain. We will assume, for the sake of argument, that Shepard's disclosures were protected and that he could establish that State Auto breached the contract.

cally, Shepard contends that after his presentation, State Auto colluded with Meridian to create a $25 million break-up fee that effectively detracted any would-be suitors from coming forward with higher competing offers. Shepard also claims that State Auto boosted its offer price from $27 to $30 per share (knowing that Shepard had informed Meridian that he would not bid higher than $27 per share). Shepard argues:

> It is undisputed that Defendants' acquisition of Meridian resulted in the forced sale of Shepard's MIGI [Meridian] shares to Defendants, over Shepard's objection. Given that, if a reasonable jury could conclude that Defendants breached the Agreement by "trad(ing) in" MIGI stock, and could conclude that Shepard's shares were worth more than $30 per share, then the jury not only *could* conclude that Defendants *caused* the resulting loss to Shepard, but *would* conclude that. In other words, Defendants' "trad[ing] in" MIGI stock was undeniably the cause of Shepard's loss of his MIGI shares.

Pls. Br. at 54. But this argument misses the mark: it is not enough for Shepard to show merely that State Auto breached its confidentiality agreement with Shepard and that Shepard's shares were arguably worth more than $30 per share. Even if both of those allegations were true, Shepard must still show that there is the requisite nexus between State Auto's breach and Shepard's subsequent damages. *See, e.g.*, *Parke State Bank*, 659 N.E.2d at 1034. That is, State Auto's breach must be a cause-in-fact (*i.e.*, a "substantial factor") of Shepard receiving the allegedly inadequate consideration for his shares. *See id.*

When the causation issue is properly framed, Shepard's argument converts to what appears to be a concession that he does not have much—if any—evidence to establish causation: "Whether Defendants' disclosures to Merid-

ian of the *substance* or *existence* of the [confidentiality] Agreement, or of Plaintiffs' other confidential information, was a *cause* of Plaintiffs' damages is less clear, but it is still a matter that a reasonable jury could easily resolve in Plaintiffs' favor." Pls. Br. at 54. Aside from this conclusory statement, Shepard does not explain how "a reasonable jury could easily resolve" this matter in his favor. Indeed, he faces a steep uphill climb here because the undisputed facts show that during the entire courtship history for Meridian (which spanned many months), no one—including Shepard—offered to pay more than $30 per share to acquire Meridian. Thus, the undisputed facts tend to show that Shepard received a premium over the open-market price for Meridian. In other words, how can Shepard establish that State Auto's breach was a substantial factor in his receiving "only" $30 per share remuneration when no one else in the marketplace was willing to pay more?

To circumvent this thorny issue, Shepard provides two circuitous arguments. First, he contends that State Auto created a $25 million dollar break-up fee that suppressed other entities from coming forth with higher bids. According to Shepard's expert, this unusually high break-up fee *could* have prevented other would-be suitors from entering into the bidding for Meridian. Essentially, Shepard contends that State Auto requested this restrictive provision to prevent other would-be-bidders from coming out of the woodwork with higher bids, and, importantly, did so based upon Shepard's confidential disclosure that he personally valued Meridian to be worth more than $30 per share. But both Shepard and his expert conceded that they could not identify any other company that was willing to pay more than $30 per share for Meridian. Indeed, no company came forward with an offer higher than $20 or $27 per share in the two-month period between Shepard's initial public offer of $20 per share, his subsequent amended offer of $27 per share, and State Auto's final bid. Moreover,

despite his proclamations that Meridian was worth as high as $45 per share, Shepard himself never made an offer greater than $27 per share. Thus, Shepard is pointing to nothing more than a discrepancy between a company's hypothetical value on paper and its value in the open marketplace. As any disappointed seller can document, market forces do not always map one-to-one with theoretical valuations.

Shepard also contends that State Auto wrongfully increased its bid from $27 to $30 per share, relying on his confidential (but admittedly inaccurate) information that he would not bid higher than $27 for Meridian. But this is a curious argument because State Auto's bid was an *increase* in price above what Shepard was willing to offer, and, in any event, was the highest bid received by Meridian. Shepard seems to be suggesting—although he does not develop this precise argument—that State Auto internally valued Meridian at more than $30 per share, and may have calibrated its bid to *just* exceed Shepard's bid, and yet still remain below what its "true" bid would have been but-for the misuse of Shepard's confidential information. Under this view, the Meridian deal closed at a lower price than what would have been the "real" price without Shepard's revelations. The record does contain State Auto documents suggesting that State Auto initially valued Meridian at approximately $35 per share (with some variations). As a result, perhaps a jury could infer that State Auto lowered its offer price to $30 per share, purportedly because it knew that Shepard would not raise his $27 per share offer. Yet there is nothing in the record to establish that Meridian intended to *begin* its offer at $35 per share, much less intended to continue bidding against itself. To the contrary, if State Auto hoped to end the bidding at $35 per share, it certainly would not start its offer at that number—and, indeed, as shown below, it started its bidding at the lower amount of $27 per share. As a result, the fact that the

deal closed at a favorable price to State Auto (but nonetheless not a fire-sale price under anyone's terms—recall that Shepard was pitching $20 and $27 per share as very favorable valuation for the shareholders) may speak more to Meridian's eagerness to avoid a hostile takeover by Shepard.

This argument may be the closest that Shepard comes to a triable issue of fact, but, again, we are carrying much of the weight here, since Shepard does not develop it. Nonetheless, it still is not enough for at least two reasons. First, it is undisputed that on September 7, 2000, approximately one month before its confidential meeting with Shepard (and thus before it could have possibly betrayed Shepard's confidences), State Auto tendered a $27 per share private offer to Meridian. Thus, $27 was State Auto's starting point and there is nothing in the record to indicate that State Auto was likely to ratchet any subsequent offer above the $30 per share price (despite its private valuation estimates pertaining to the *final* potential bid price), particularly when there was no other suitor offering anything higher than $27 per share. And Shepard withdrew his claim of a lost business opportunity. Therefore, he cannot claim that State Auto's increased price deprived him of the Meridian acquisition. As a result, Shepard's argument still requires the jury to engage in rampant speculation and conjecture as to what State Auto would have bid in the absence of the breach, which, for the reasons noted above, is simply too tenuous a thread to support the number and nature of inferences that Shepard seeks to invoke. Without more, Shepard cannot establish that State Auto artificially altered its bidding in reliance on his disclosures.

Finally, although Shepard does not articulate this theory in these precise terms, his argument could be read as suggesting that State Auto's increase to $30 per share increased the likelihood of the deal being consummated.

Therefore, but-for Shepard's disclosures the deal would not have gone through at all, and Shepard's shares presumably could have been redeemed at a higher price somewhere down the road. But there is nothing in the record pertaining to the likelihood of another potential suitor, nor any evidence tending to show that Shepard could have consummated the deal himself, much less that market conditions made it inevitable that Meridian's share price would subsequently rise. As a result, we once again return to the fundamentally speculative nature of Shepard's causation argument. And although Shepard is correct in maintaining that, in the normal course, the issue of causation is one for the jury, that is only the case where there is sufficient evidence to allow a jury to reach a factual conclusion without engaging in undue speculation. *See Luigino's, Inc. v. Peterson*, 317 F.3d 909*,* 911-12 (8th Cir. 2003) (affirming summary judgment because plaintiff could not establish a causal link between defendant's misuse of confidential information and damages)*; Buckner*, 75 F.3d at 293-94 (affirming summary judgment because the plaintiff could not establish the "critical element of causation").

The same fundamental problems noted above apply to the issue of damages. Indiana law requires a sufficient degree of certainty to support damage awards. The typical recovery for breach of contract is a party's expectation interest (*i.e.*, the benefit of the bargain). *Fowler*, 612 N.E.2d at 603. But here, Shepard's contract was a confidentiality agreement (without a liquidated damages provision)—not a contract for the sale of Meridian. The absence of any other would-be suitor willing to pay more than $30 per share renders any damages above that amount inherently speculative, and, importantly, would result in a windfall to Shepard. Again, when a plaintiff cannot establish damages with sufficient certainty to avoid speculation or conjecture by the jury, the defendant is entitled to judgment as a matter of law. *See, e.g.*, *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 1001

(7th Cir. 1992) (affirming summary judgment because "[a]ppellant presented nothing outside the pleadings that allowed any inference of damage"); *see also Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1363 (7th Cir. 1996) (noting that where a party could not prove its lost profits with reasonable certainty, summary judgment or judgment as a matter of law may be appropriate).

Indeed, in light of the comments above, it does not appear that Shepard has suffered *any* actual or consequential damages here—aside from the indignity of having his confidences betrayed. A minor complication (which neither party mentions) arises from the fact that Indiana recognizes nominal damages in breach of contract actions. *See Am. Fletcher Nat'l Bank & Trust Co. v. Flick*, 252 N.E.2d 839, 846 (Ind. Ct. App. 1969) ("The law presumes that at least nominal damages result from a harm."); *Smith v. Bruning Enterprises, Inc.,* 424 N.E.2d 1035, 1037 (Ind. Ct. App. 1981) (holding that nominal damages award was appropriate where "the evidence supporting the damages was speculative"). Thus, notwithstanding the policy considerations that would mitigate against the costs and resources expended on a trial where only nominal damages were available from the outset, Shepard *may* nonetheless be entitled to try this case in some form under those terms (provided he had sufficient evidence to establish a breach of the contract—an issue that we do not reach). But we need not decide whether Indiana law supports such an odd result because Shepard cannot establish the requisite causation in this case.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the defendants.

No. 05-3567                                                          13

A true Copy:

    Teste:

                           _____
                           *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*