In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1377

DAVID THORNE,

*Plaintiff-Appellee,*

*v.*

MEMBER SELECT
INSURANCE COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 09 C 87 — **John E. Martin**, *Magistrate Judge.*

ARGUED DECEMBER 8, 2017 — DECIDED FEBRUARY 12, 2018

Before KANNE, and ROVNER, *Circuit Judges,* and DURKIN,
*District Judge.*[*]

[*] The Honorable Thomas M. Durkin, Northern District of Illinois, sitting by designation.

DURKIN, *District Judge*. David Thorne has a property insurance policy with Member Select Insurance Company. Thorne brought suit against Member Select when it denied his claim for coverage after his house burned down. A jury awarded Thorne $87,000, and the district court denied Member Select's motion for judgment as a matter of law. Member Select appeals from that order.

## I. Background

Thorne's house at 726 Arbogast Street in Griffith, Indiana, burned down completely in February 2008. Thorne chose not to rebuild the house. Member Select refused to cover the loss because it determined that either Thorne or his brother (who was living in the house and was the only person besides Thorne who had a key) intentionally set the fire.

After the jury's verdict in Thorne's favor, Member Select moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. Member Select argued: (1) there was insufficient evidence for the jury to find that Thorne was a resident of the house (as required for recovery under the policy); and (2) there was insufficient evidence for the jury to determine damages. Member Select appeals from the district court's post-trial decision in Thorne's favor on those two issues. Member Select also argues that the district court misinterpreted the policy's loss coverage provision in evaluating whether the evidence was sufficient to support the jury's damages award.

## II. Standard of Review

We review a district court's refusal to grant a Rule 50 motion for judgment as a matter of law *de novo*. *See Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822

(7th Cir. 2016). "Judgment as a matter of law is proper 'if a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015) (quoting Fed. R. Civ. P. 50(a)(1)). "We construe the trial evidence 'strictly in favor of the party who prevailed before the jury.'" *Empress Casino*, 831 F.3d at 822 (quoting *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012)). "Although we must determine that more than 'a mere scintilla of evidence' supports the verdict, we do not make credibility determinations or weigh the evidence." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013) (quoting *Hossack v. Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007)). "In other words, our job is to decide whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion." *May*, 716 F.3d at 971. Rule 50(b) permits us either to enter judgment for the trial loser or to order a new trial.

### III. Analysis

#### A. Residence

The policy requires the house to be Thorne's "residence" for him to be entitled to coverage for its loss. Member Select argues that the evidence at trial was insufficient for the jury to make that finding.

The parties do not dispute that the factors relevant to determining residence are: (1) Thorne's physical presence in the house; (2) whether Thorne had a subjective intent to reside there; and (3) Thorne's access to the house and its contents. *See Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1159 (7th Cir. 1993). The district court instructed the jury accordingly.

In its decision on Member Select's Rule 50 motion, the district court summarized the evidence concerning Thorne's residence as follows:

> [Thorne] testified that he intended to live at the Property. He also testified that he kept almost all his personal belongings at the Property, that his mail was delivered there, and that he went there often, even if only to pick up his mail. Furthermore, other than his brother, who had also lived at [the] house, [Thorne] was the only person with keys to the house. All this tends to show, even minimally, that the Property was [Thorne's] "residence" under Indiana law.
>
> There is also significant evidence supporting a finding that the Property was not [Thorne's] residence. Even though it was the middle of winter at the time of the fire, [Thorne] did not know that the Property's gas or electricity had been shut off. [Thorne's] brother rarely saw [Thorne] at the Property, and [Thorne] had been sleeping almost exclusively at his warehouse. In fact, [Thorne] had not been to the Property in over three weeks before the fire.

Additionally, Thorne testified that in the eight months leading up to the fire, he stayed at the house overnight fewer than 20 times. Thorne further testified that he spent minimal time at the house because he worked extensive hours as a millwright and on his side job as a mechanic. He ate out, showered at work, and washed his clothes at a laundromat.

Although Thorne spent significant time away from the house—even sleeping at his workshop on a regular basis—there was sufficient evidence for a reasonable juror to conclude that the house was Thorne's "residence." He owned it, had free access to it, and kept personal belongings there. While he spent significant time at his workshop, he did so because he worked long hours. He did not cook, shower, or clean clothes at either the house or his workshop. The evidence was sufficient to demonstrate that Thorne had a "subjective intent" to reside in the house. *See Alexander*, 982 F.2d at 1159. The district court was right not to disturb the jury's verdict on this issue.

### B. *The Policy's Loss Provision*

Member Select also argues that the district court erred in interpreting the meaning of the term "actual cash value" in determining whether the jury's damages verdict was reasonable. The policy includes the following relevant provisions regarding loss:

> We will pay Actual Cash Value at the time of loss in settlement of loss to: personal property. … This includes deduction for depreciation. We will pay not more than: the cost to repair or replace the damaged property with property of like kind and quality; …

> We will pay the cost to repair or replace the damaged part of the Dwelling … with equivalent construction and for equivalent use, without deduction for depreciation if, at the time of loss, the amount of insurance for the Dwelling … is 80% or more of the Replacement Cost.

> If, at the time of loss, the amount of insurance for the Dwelling ... is less than 80% of the Replacement Cost, we will pay the larger of the following amounts:
>
> a. the Actual Cash Value of the damaged part of the Dwelling ... with equivalent construction and for equivalent use; or
>
> b. the amount of the loss multiplied by the ratio of the amount of insurance multiplied by the ratio of the amount of insurance on the Dwelling ... to 80% of its Replacement Cost.
>
>   . ...
>
> If the cost to repair or replace the damaged property is more than $5,000, we will not be liable for Replacement Cost until actual repair or replacement is completed with equivalent construction and for equivalent use.
>
>   . ...
>
> If you decide not to repair or replace the damaged property with equivalent construction and for equivalent use, settlement will be on an Actual Cash Value basis; this includes deduction for depreciation.

Despite capitalizing it and using it multiple times, the policy unhelpfully does not expressly define the term "actual cash value."

As one commentator has noted, "[a]lthough the term actual cash value is found in many property insurance policies," and the "generally-accepted meaning of the term" is

replacement cost less depreciation, "it is quite common for the phrase not to be defined in [property insurance] policies." Johnny Parker, *Replacement Cost Coverage: A Legal Primer*, 34 WAKE FOREST L. REV. 295, 332 n.5 (1999). The frequent failure of insurance companies to provide a definition of this term in their policies has led to "much litigation regarding how actual cash value should be determined and what it means," with the result that "the case law of the respective jurisdiction should be consulted when attempting to ascertain the meaning of actual cash value." *Id.*

As the Indiana Supreme Court has explained, courts around the country use four primary methods to give meaning to the term "actual cash value" when it is used in an insurance policy but not expressly defined. Those methods are: (1) replacement cost, without deduction for depreciation; (2) market value; (3) replacement cost with deduction for depreciation; and (4) the broad evidence rule. *See Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 355-56 (Ind. 1982). The last three all take depreciation (or decrease in value due to use and age) into account. In *Travelers*, the Indiana Supreme Court adopted the broad evidence rule as the default interpretation of the term "actual cash value." 442 N.E.2d at 352-58.

Because the policy at issue here does not contain an express definition of "actual cash value," the district court applied the broad evidence rule to interpret that term. "Under the broad evidence rule, ... parties [are] entitled to introduce evidence of 'every fact and circumstance which would logically tend to the formation of a correct estimate of the loss.'" *Travelers*, 442 N.E.2d at 357 (quoting *McAnarney v. Newark Fire Ins. Co.*, 159 N.E. 902, 905 (N.Y. 1928)).

Member Select argues, however, that the policy implicitly defines "actual cash value" as "replacement cost less depreciation," which is a narrower formula than the broad evidence rule.[1] Member Select contends that its interpretation is supported by the policy's juxtaposition of "two separate methods by which losses could be settled," i.e., actual cash value and replacement cost. The policy expressly provides that when replacement cost is the relevant method of loss settlement, it is calculated "without deduction for depreciation." The policy also expressly provides that calculation of actual cash value "includes deduction for depreciation." On this basis, according to Member Select, the term "actual cash value" must mean "replacement cost less depreciation." In other words, Member Select asks us to interpret the policy language "settlement will be on an Actual Cash Value basis; *this includes* deduction for depreciation," to mean "settlement will be on an Actual Cash Value basis; *meaning/defined as replacement cost with* deduction for depreciation."

The problem with this argument is that the policy never mentions "replacement cost" in conjunction with "actual cash value." Of course, when used in the context of property insurance, depreciation is often applied to replacement cost. Apparently on this basis, Member Select jumps to the conclusion that since the policy requires "actual cash value" to "include" depreciation, "actual cash value" must be defined as "replacement cost less depreciation." But as discussed, courts have recognized that the term "actual cash value" can

---

[1] Curiously, this position by Member Select would result in some cases in a higher payout, because "replacement cost less depreciation" does not necessarily take into account obsolescence of a property while the broad evidence rule does account for it.

have a much broader connotation, even as it continues to account for depreciation. Just because "actual cash value" includes depreciation does not mean it is limited to "replacement cost less depreciation." All of the various methods courts use to interpret the term "actual cash value"—i.e., "market value," "replacement cost less depreciation," and the "broad evidence rule"—account for depreciation. Thus, Member Select's argument focusing on how the term "depreciation" is used in the policy is insufficient to justify the conclusion that "actual cash value" means "replacement cost less depreciation," as opposed to being defined by the broad evidence rule. Because the policy does not expressly define "actual cash value" to mean "replacement cost less depreciation," the district court was right to look to Indiana's broad evidence rule in interpreting the policy, despite the policy's requirement that "actual cash value" include depreciation.

Moreover, even if Member Select is correct that the policy can be interpreted to define "actual cash value" as "replacement cost less depreciation," the term "depreciation" is itself ambiguous. The *concept* of depreciation is well understood. *See In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 574 (8th Cir. 2017) ("'Depreciation' is a concept with a well understood meaning—'decline in an asset's value because of use, wear, obsolescence, or age.'" (quoting Black's Law Dictionary (9th ed. 2009)); *see also Carey v. Am. Family Brokerage, Inc.*, 909 N.E.2d 255, 262 (Ill. App. Ct. 2009) ("Depreciation in an insurance context, which is different than depreciation in an accounting context, means the decrease in the actual value of property based on its physical condition, age, use, and other factors that affect the remaining usefulness of the property." (citing Black's Law Dictionary (8th ed. 2004)). "But the *method of calculating* a depreciation deduction is subject to con-

flicting opinion as to the reasonableness of the resulting es-
timate." *State Farm Fire,* 872 F.3d at 574 (emphasis added). As
the Eighth Circuit recently noted in addressing a case in-
volving property loss, "Black's Law Dictionary lists no fewer
than ten different depreciation methods to estimate the de-
cline in an asset's value over time." *Id.* Thus, even following
Member Select's interpretation of the policy in this case does
not provide a clear method for calculating loss that should
have taken precedence over the broad evidence rule.

At bottom, if Member Select wanted to define "actual
cash value" as "replacement cost less depreciation," it easily
could have done so expressly. Member Select chose not to.
We hold the resulting ambiguity against the drafter Member
Select. *See Trinity Homes, LLC v. Fang,* 848 N.E.2d 1065, 1068
(Ind. 2006) ("[I]t is generally appropriate to construe an am-
biguous agreement against its drafter."). The district court
was correct to use the broad evidence rule to interpret the
policy.

### C. Evidence of Damages

Member Select also contends that even if the broad evi-
dence rule is the proper standard, there was insufficient evi-
dence for the jury to determine damages. We have previous-
ly recited the standard for proof of damages under Indiana
law:

> Under Indiana law, a plaintiff carries the bur-
> den to plead and prove damages. [*Lincoln Nat'l
> Life Ins. Co. v. NCR Corp.*, 772 F.2d 315, 320 (7th
> Cir. 1985)]. Importantly, "[a] mere showing of a
> breach of contract does not necessarily entitle a
> plaintiff to damages." *Id.* Instead, a plaintiff is

> limited to recovering only the losses actually suffered from the breach, and an injured party may not be placed in a better position than he would have enjoyed if the breach had not occurred. *Fowler v. Campbell*, 612 N.E.2d 596, 603 (Ind. Ct. App. 1993). Moreover, damages cannot be based on mere speculation and conjecture. Rather, a plaintiff must have adequate evidence to allow a jury to determine with sufficient certainty that damages in fact occurred, and, if so, to quantify such damages with some degree of precision. *See id.*; *Turbines v. Thompson*, 684 N.E.2d 254, 258 (Ind. Ct. App. 1997); *Fowler*, 612 N.E.2d at 603. Thus, "[a] damage award must be referenced to some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits or direct inference from known circumstances." *Fowler*, 612 N.E.2d at 603.

*Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006).

The jury was presented with the following evidence of damages: Thorne's brother bought the house for $86,000 in 1998; Thorne bought the house for $75,000 in 2002; around 2004 when Thorne had paid the mortgage down to $67,000, he opened a $20,000 line of credit secured by the house; and Thorne testified about the general condition of the house, the improvements he made to the house, and its contents before and after the fire. Thorne argues that the jury's award of $87,000 is reasonable based on adding the $20,000 line of

credit to the $67,000 remaining on the mortgage in 2004, plus an estimate of the value of his lost personal possessions.

Member Select argues that none of this is evidence of the value of the house "at the time of loss," as the most recent data point (the $20,000 secured credit line) was about four years old at the time of the fire. Member Select also argues that the jury could not reach a reasonable verdict without "opinion" evidence regarding the house's value at the time of the fire—whether from Thorne or another witness.

Addressing the second argument first, Member Select has not cited any authority requiring "opinion" evidence for a jury to properly decide the issue of damages in a case like this. To the contrary, the Indiana Supreme Court has held that under the broad evidence rule, "any . . . fact reasonably tending to throw light upon the subject is relevant," including "original cost." *Travelers*, 442 N.E.2d at 356 (quoting *McAnarney*, 159 N.E. at 905). "'[I]n applying the rule, a court may take into account market value, replacement cost, and depreciation. In addition, such factors as location and obsolescence may be considered.'" *Gregory & Appel Ins. Agency v. Philadelphia Indem. Ins. Co.*, 835 N.E.2d 1053, 1061 (Ind. Ct. App. 2005) (quoting *Ohio Cas. Ins. Co. v. Ramsey*, 439 N.E.2d 1162, 1169 (Ind. Ct. App. 1982)). Thus, the purchase price history, secured loan value and the characteristics of the property presented to the jury in this case are all relevant to value. *See Barrett v. Prudential Prop. & Cas. Ins. Co.*, 790 F.2d 842, 845 (11th Cir. 1986) (applying the broad evidence rule and holding that "[t]he original purchase price of the house, its rental value, the proof of loss statement, and the contractor's estimate all constituted relevant, probative evidence

from which a jury could logically base a determination as to the actual cash value of the destroyed property").

Moreover, the Indiana Supreme Court has suggested that "opinion" evidence is not required. In *Travelers*, the court explained that the broad evidence rule "requires the fact-finder to consider all evidence an expert would consider." 442 N.E.2d at 357 (quoting *Elberon Bathing Co., Inc. v. Ambassador Ins. Co., Inc.*, 389 A.2d 439, 444 (N.J. 1978)). As Member Select acknowledges, Indiana courts have held that "[a]n owner may testify as to the value of property," as long as "there [is] a basis for that valuation." *Court View Centre, LLC v. Witt*, 753 N.E.2d 75, 82 (Ind. App. Ct. 2001). If a home-owner's testimony can be a basis for determining loss under a property insurance policy, certainly the evidence in this case of actual sales and secured loan amounts can also be sufficient evidence of loss.

Further, as Member Select's counsel conceded at oral argument, opinion evidence would not be required in the hypothetical case of a house burning down the day after its sale. In that case, the sale price would be sufficient evidence of the value of the house even absent opinion evidence. The question, then, is not whether opinion evidence is always necessary to reach a reasonable verdict on the value of a house. Rather, the question is whether the evidence presented to the jury was sufficient to make a reasonable damages determination in this case.

Member Select's better argument is that no evidence was presented to the jury regarding the value of the land on which the house was constructed. This is relevant because a property purchase price—the primary evidence of damages

received by the jury in this case—pays for both the land and the house, and the fire did not destroy the land.

But the lack of evidence regarding the value of the land in particular did not impair the jury's ability to quantify damages "with some degree of precision" in this case. *See Shepard*, 463 F.3d at 745. Thorne lost not just his house but the contents of the house. Thus, even if the jury found that the market value of the house and land together was $87,000, they still could have reasonably offset the value of the land with the value of the contents of the house based on Thorne's testimony about those contents. This is a sufficiently "defined standard," *Shepard*, 463 F.3d at 745, with reference to which the jury could reasonably determine damages. Specific evidence of the land's value was not required for the jury's verdict to be reasonable in this case.

In sum, as explained by the Indiana Supreme Court in *Travelers*, the goal of property insurance is indemnity; i.e., "to make the insured whole but never to benefit him." 442 N.E.2d at 352. The evidence presented to the jury was reasonably precise evidence of what Thorne's house and its contents were worth, even if it was somewhat outdated. The jury's award tracked this evidence. The jury's reliance on such evidence, even absent lay or expert opinion evidence, does not make the award unreasonable. To the extent Member Select believed that the age of the evidence made it misleading, or that additional evidence regarding the value of the land would have made the damages verdict more accurate, Member Select could have presented such evidence itself. It chose not to.

## IV. Conclusion

The denial of Member Select's motion for judgment as a matter of law is AFFIRMED.