In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 23-1555 and 23-1556

CHARLES HESS, *et al.*,

*Plaintiffs-Appellees, Cross-Appellants,*

*v.*

BIOMET, INC. and ZIMMER BIOMET HOLDINGS, INC.,

*Defendants-Appellants, Cross-Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:16-cv-00208-JD-MGG — **Jon E. DeGuilio**, *Chief Judge.*

_____

ARGUED DECEMBER 4, 2023 — DECIDED JUNE 25, 2024

_____

Before ROVNER, SCUDDER, and PRYOR, *Circuit Judges.*

SCUDDER, *Circuit Judge.* When medical-device manufacturer Zimmer Biomet was still in its infancy, it signed a generous compensation agreement with six leading sales distributors, guaranteeing them a lifetime of long-term commissions on all sales "made within the subject distributorship" after their retirement. The company proceeded to grow exponentially, acquiring half a dozen competitors, expanding its product lines, and branching into new medical

specialties. Biomet's growth generated a dispute regarding which categories of products fell "within the subject distributorship" such that the company must continue to pay long-term commissions on their sale. The district court determined that the agreement was ambiguous on the point and sent the case to trial. The jury returned a split verdict, finding that Biomet owed long-term commissions on some products but not others. Biomet then appealed the denials of its motions for summary judgment and judgment as a matter of law, and the distributors cross-appealed the dismissal of two counts of their complaint.

We affirm across the board. The district court was right to dismiss the two counts in the distributors' complaint. It also correctly determined that the distributorship agreement was ambiguous regarding the particular categories of products it covered. And we have little difficulty concluding that the trial record supports the jury's verdict in favor of the distributors on their Indiana breach-of-contract claim.

## I

Zimmer Biomet is one of the world's largest medical-device manufacturers, surpassing $7 billion in annual sales. But it did not start out that way.

In the early 1980s, Biomet was a small startup with a limited catalog of joint-replacement products. Seeking to expand, the company approached a handful of well-connected sales representatives and offered them generous compensation to join its fledgling operation. The strategy worked. From 1980 to 1983, Biomet successfully poached six high-earning salespeople from competitors, including lead plaintiff Charles Hess.

Hess and his colleagues signed an identical distributorship agreement with Biomet. The agreement guaranteed exclusive rights to sell "Biomet products" within specific regions and receive commissions up to 30%. To further sweeten the deal, Biomet enrolled the distributors in a "long-term commission program," under which they would continue to receive a specified fraction of the company's "net sales" after retirement. The agreement defined "net sales" as follows: "gross sales made within the subject distributorship at the time this program is initiated and actually collected by Biomet."

Biomet grew rapidly in subsequent years. By 1990 the company had acquired three of its former competitors. These acquisitions allowed Biomet to expand its existing suite of orthopedic products while also branching into new specialties like sports medicine.

Biomet allowed the distributors to sell new product lines on a case-by-case basis. The company gave Hess and his colleagues unfettered access to reconstructive products, including joint-replacement products. But it prohibited them from selling electro-stimulation devices, deciding to retain the salesforce of an acquired company instead. For sports medicine, Biomet took a hybrid approach. It allowed the distributors to sell products marketed through its subsidiary Arthrotek but only if they executed a new distributorship agreement. Unlike the original distributorship agreement, the Arthrotek contract did not provide long-term commissions.

These restrictions did not sit well with the distributors. One, Frank Shera, sued Biomet for breach of contract. He later reversed course, conceding in a settlement that his distributorship agreement had "not contractually grant[ed] [] the

right to sell the products of Biomet's present subsidiaries or companies which Biomet may acquire in the future." The other five distributors did not participate in Shera's lawsuit or settlement.

Between 1995 and 1999, each of the six distributors retired. Pursuant to the distributorship agreement, Biomet began paying long-term commissions on its sales of reconstructive products. But the company excluded all other product lines when making payments.

Biomet's expansion continued. In 2012 the company acquired DePuy Trauma, substantially increasing its previously small selection of trauma-related products. Biomet added other product lines as well, including dental, spinal, and biopharmaceutical.

Around 2015 Biomet entered merger negotiations with its main competitor Zimmer. In preparation, Biomet approached Hess and fellow distributors with an offer to buy out their rights to receive long-term commissions.

The buyout proposition quickly fell apart. In talking with Biomet, the distributors learned for the first time that the company had not been paying long-term commissions on any products other than reconstructive surgical items. Viewing this as a breach of the distributorship agreement, the six retired distributors sued Biomet in federal court in Indiana, invoking diversity jurisdiction.

The distributors' complaint contained six counts—three of which remain relevant on appeal. Count 1 alleged that Biomet breached the distributorship agreement by failing to pay long-term commissions on "all Biomet products sold in the distributors' respective territories." Count 2 presented a

different theory of breach, claiming that Biomet violated the agreement by rebranding products under Zimmer's name. Finally, Count 3 asserted that Biomet refused to honor its obligation to pay long-term commissions on "all products sold by Biomet or Zimmer Biomet in the [] Distributors' former territories."

Biomet moved to dismiss the complaint under Rule 12(b)(6). The district court granted the motion in part, dismissing Counts 2 and 3 while permitting Count 1 to proceed. The court determined that the second count failed to properly allege a breach of contract because no provision of the distributorship agreement prohibited Biomet from rebranding products. Similarly, the court determined that the agreement did not require Biomet to pay long-term commissions on products belonging to Zimmer or Zimmer Biomet, largely undermining the basis for Count 3. But Count 1 survived and discovery ensued.

In time both parties moved for summary judgment. Hess argued that the distributorship agreement required Biomet to pay long-term commissions on all products regardless of the category they fell into, when Biomet added them to its product line, or whether they belonged to a subsidiary. Biomet responded that the agreement applied only to reconstructive surgical products—the primary type that the distributors had been permitted to sell during their tenure (without executing an additional contract).

The district court denied both motions. It concluded that the plain language of the distributorship agreement was ambiguous regarding whether long-term commissions applied only to certain product types. The district court then observed that under Indiana law, the meaning of an ambiguous

contract depends on the parties' intent at the time of signing—a question of fact to be informed by extrinsic evidence. So the district court ordered a jury trial to determine which categories other than reconstructive products—if any—fell within the long-term-commission clause.

At the close of the distributors' case in chief, Biomet moved for judgment as a matter of law under Rule 50(a), contending that the evidence was insufficient to establish that the parties originally intended for the distributorship agreement to apply without product limitations. The district court took the motion under advisement and proceeded with jury instructions.

The district court provided jurors with a two-part special verdict form. For each distributor, the form asked whether Biomet had breached a contractual obligation to pay long-term commissions. If so, the form then asked jurors to specify the particular categories of products from which Biomet had wrongfully withheld commissions. It listed seven: trauma, biologics, sports medicine, micro-fixation, spine, dental, and electrical stimulation.

The jury found Biomet liable for breaching its agreement with each of the six distributors. For five, the jury concluded that the company owed long-term commissions on all sports-medicine and trauma products. For Frank Shera, the jury awarded damages only for unpaid commissions on trauma products.

Biomet reacted to the verdict by renewing its Rule 50 motion. The company insisted that no reasonable jury could have found that Biomet owed long-term commissions on products it sold only through subsidiaries or on products acquired only

after the distributors retired. The district court denied the motion, determining the evidence sufficient to support the verdict.

Biomet appealed the denial of summary judgment, claiming that the distributorship agreement unambiguously limited long-term commissions to reconstructive products. The company also appealed the denial of its Rule 50 motion, contending that the evidence fell short of establishing that the agreement extended to sports-medicine or trauma products. Hess defended the judgment on both fronts while also cross-appealing the dismissal of Counts 2 and 3. We address each contention in turn.

## II

Denials of summary judgment on the grounds of factual sufficiency are unreviewable on appeal, given that the record developed at trial "supersedes the record existing at the time of the summary-judgment motion." See *Dupree v. Younger*, 143 S. Ct. 1382, 1388–89 (2023) (citing *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)). But unsuccessful summary-judgment movants remain free to appeal a "purely legal" basis for denial that "can be resolved without reference to any disputed facts." *Id.* at 1389. This includes questions of contract interpretation. See *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015).

Federal courts sitting in diversity interpret contracts according to the law the forum state would apply to the dispute. See *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497 (1941). Indiana, the forum state here, generally defers to contract provisions specifying the law that should guide a court's interpretation. See *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d

1157, 1162 (Ind. 2002). So our analysis is governed by Indiana law—the jurisdiction named in the distributorship agreement's choice-of-law provision.

Under Indiana law, the "goal in contract interpretation is to determine the intent of the parties at the time that they made the agreement." *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 752 (Ind. 2018) (internal quotation marks omitted). When the language is clear, courts confine themselves to the "four corners" of the agreement and apply "its plain and ordinary meaning in view of the whole contract, without substitution or addition." *Id.* at 752, 756. If contract language is ambiguous, however, Indiana courts move beyond the contract's text, viewing the parties' intent as a question of fact to be informed by extrinsic evidence. See *First Fed. Sav. Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990); *Celadon Trucking Serv., Inc. v. Wilmoth*, 70 N.E.3d 833, 842 (Ind. Ct. App. 2017). A contract is ambiguous where "reasonable people could come to different conclusions as to its meaning." *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006).

Both sides insist that the language of the distributorship agreement unambiguously supports their position. According to Biomet, the agreement clearly limits long-term commissions to the primary category of product that the distributors sold during their tenure: reconstructive devices. Hess contends that the agreement plainly sweeps more broadly, covering *all* products sold by Biomet, Zimmer Biomet, and its subsidiaries. Both sides are mistaken.

Contrary to Hess's position, the distributorship agreement contains clear product-based limitations. Section 9(e) promises long-term commissions only on "sales made within the subject distributorship at the time this program is initiated."

If the long-term-commission program extended to all products sold by Biomet, the phrase "within the subject distributorship" would serve no purpose. By including it, the parties evidenced their intent for long-term commissions to extend only to products falling within the scope of the distributorships as originally conceived.

Hess disagrees with the interpretation that "within the subject distributorship" imposes product-based limitations on the long-term-commission program. He insists that that phrase creates merely a geographic limitation by referencing the regions established for each respective distributor. But that interpretation conflicts with the language of both § 9(e) and the broader contract.

Common dictionaries define "distributorship" as "a franchise held by a distributor." *Distributorship*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (2d ed. 1983); see also *Distributorship*, THE RANDOM HOUSE COLLEGE DICTIONARY (rev. ed. 1980) (same). Hess provides no authority—nor have we found any—that supports his contrary interpretation, under which "distributorship" refers not to the franchise itself but only to the geographic region where it operates. So we assume, absent some textual indication to the contrary, that § 9(e) carries that term's established common meaning: a distribution franchise.

A broader look at the distributorship agreement supports this interpretation. When the agreement refers to a geographic area, it does so explicitly by using the word "territory." See § 4(b) (referencing the "territory(s) [that] exist within such distributorships"); § 5(b) (describing the "subject territory(s)"); § 9(h)(1) (mentioning "the territory(s) then assigned to distributor"). In sharp contrast, the agreement

reserves the word "distributorship" to refer to the franchise as a whole rather than its territorial boundaries. Section 3(a), for instance, states that "Biomet agrees not to terminate the distributorship during the first twelve [] months." Similarly, § 4(a) provides that Biomet may "not [] reduce the territory(s) of a distributorship," and § 9(d) describes how to calculate "'[t]he long-term commission' … for the distributorship." The last example is particularly salient. Section 9(d) immediately precedes the key language we are interpreting in § 9(e). And § 9(e) refers back to § 9(d) by referencing "the *subject* distributorship" (emphasis added). Given this express cross-reference—and the assumption that a contract term carries a single consistent meaning across provisions—we see no reason to read "distributorship" any differently in § 9(e) than in the rest of the agreement.

Having taken our own hard look at the agreement, we conclude that the plain language of § 9(e) unambiguously obligates Biomet to pay long-term commissions only on products that fell "within the subject distributorship" as the parties originally conceived it—not all products sold in the geographic boundaries assigned to the distributors.

But our analysis does not end there. Although we agree with Biomet that the distributorship agreement unambiguously imposes product-based limitations on long-term commissions, the company asks us to go one step further. It urges us to conclude that the agreement's plain language extends to only one type of product: reconstructive items. This is where we part ways.

The agreement itself sheds little light on what products or product lines fell "within the subject distributorships." No provision, when read in isolation or together with other

language, lists the specific products subject to long-term commissions. Nor does the agreement provide any criteria to determine whether the "subject distributorship" extends to a given product category. Biomet's contention that the distributorships were limited to reconstructive products—the category from which the distributors made the overwhelming bulk of their sales—is plausible. But it is equally plausible that the "subject distributorship" extended to *all* categories from which the distributors sold at least one product, including trauma and sports-medicine items. The text alone does not obviously preclude either view.

Biomet maintains that non-reconstructive products fall outside the scope of the distributorships because the company did not offer them when the parties executed the agreement. But § 9(e), by its terms, looks not to the time of contracting but to the moment when "this [long-term-commission] program is initiated" upon the distributors' retirement. Even more, the agreement does not limit the scope of the distributorships to the products offered at the time of its execution. To the contrary, § 2(b) contemplates future expansions of Biomet's portfolio, providing that the company must pay actual sales commissions "[s]hould items be added to the Biomet standard product line that are not covered by an existing [product] category." This language is clear and important: it suggests that, so long as an item belonged to Biomet's "standard product line" when the distributors retired, the item falls within the scope of the distributorship and is thus subject to long-term commissions.

Perhaps recognizing the same point, Biomet backpedals and contends that, at a minimum, sports-medicine items cannot be considered part of Biomet's standard product line

because at all relevant times they were sold only through a subsidiary (Arthrotek) and the distributors had to sign a separate contract to market them. As a matter of fact, that may well be true, and we will return to this contention when reviewing Biomet's sufficiency-of-the-evidence challenge to the jury's verdict. But as a question of what the agreement unambiguously means as a legal matter, Biomet's position does not persuade us.

Nothing in the distributorship agreement suggests —much less requires—that items marketed through subsidiaries fall outside Biomet's standard product line. Nor does any provision indicate that what separates nonstandard from standard products is whether distributors must sign a new contract before selling them. If that were so, Biomet could unilaterally extinguish its duty to pay long-term commissions simply by demanding that its sales team submit to new contracts—an outcome at stark odds with the overarching purpose of the distributorship agreement.

Biomet also contends that the agreement cannot reach any items marketed solely through subsidiaries because those items are not "Biomet products" within the meaning of the contract. That is far from obvious, however. While defining Biomet as "Biomet, Inc.," the agreement does not describe what relationship a product must have with the company to be considered a "Biomet product." More to the point, the agreement provides no indication that the term "Biomet product" excludes products that happen to be sold by a Biomet subsidiary. In fact, § 2(b) hints at just the opposite, stating that distributors shall receive sales commissions on certain types of reconstructive products without qualifying that those products must be sold through Biomet directly.

Biomet's contrary interpretation would all but nullify its contractual obligations, allowing it to avoid paying commissions just by reassigning products to corporate subsidiaries. This would generate bizarre results elsewhere in the agreement. For instance, defining "Biomet products" to preclude those offered through subsidiaries might dramatically narrow the plaintiffs' noncompete obligations under § 6, which prohibits selling products for Biomet's competitors so long as those products were also offered "by *Biomet*." *Id.* (emphasis added). Under Biomet's reading, the distributors would be free to sell any products that competed only with ones sold by its subsidiaries. We are disinclined to conclude that the contracting parties intended to define "Biomet products" in a manner that functionally extinguishes both sides' principal obligations. See *USA Life One Ins. Co. of Indiana v. Nuckolls*, 682 N.E.2d 534, 539 (Ind. 1997) ("[I]f the plain and ordinary meaning would lead to some absurdity, or some repugnance or inconsistency with the rest of the instrument, then the grammatical and ordinary sense of the words may be modified, so as to avoid that absurdity and inconsistency." (quotations omitted)). At the very least, the agreement's text does not unambiguously require such a result as a matter of law.

In the final analysis, then, the distributorship agreement does not provide unambiguous guidance regarding whether "Biomet products" in the "standard product line" could include a subsidiary's products subject to a separate contractual arrangement. So the district court properly concluded that a jury should decide whether specific categories of products —including those marketed by a subsidiary—were subject to long-term commissions.

**III**

Biomet separately challenges the district court's denial of its motion for judgment as a matter of law. Rule 50 permits trial courts to order a directed finding on an issue if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Fed R. Civ. P. 50(a)(1). On appeal, we review Rule 50 denials without any deference to the district court's ruling. See *Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018). In doing so, we interpret the facts and draw all reasonable inferences in favor of the nonmoving party who prevailed before the jury. See *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). "Overturning a jury verdict is not something that we do lightly." *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 925 (7th Cir. 2000). We reverse "[o]nly if no rational jury could have found for the nonmovant." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019).

Our review of the trial transcript leaves us of the firm mind that the jury acted rationally in finding that Biomet owed long-term commissions on its sales of trauma and sports-medicine products. The distributors sold products belonging to both categories during their careers with Biomet. That factual reality is significant, for it allowed the jury to reasonably conclude that sports-medicine and trauma products fell "within the subject distributorship" at the time the distributors retired.

In its Rule 50 motion, Biomet argued otherwise, stressing its view that the distributorship agreement excludes sports-medicine products because they were sold pursuant to a different contract. We have no doubt that Biomet believed that its existing distributorship agreement did not cover sports-

medicine products when it acquired Arthrotek in 1990; otherwise it would not have required the execution of a new agreement. But that observation does not resolve the issue before us. What matters is not what Biomet believed in 1990 but what the company intended when it executed the original distributorship agreement approximately ten years earlier.

The jury had enough evidence to conclude that Biomet intended for the distributorship agreement to cover later-acquired product lines like sports medicine. Multiple distributors testified that Biomet's stated intent at the time the parties executed the agreement was for the company to provide long-term commissions on all future sales. In an interrogatory response admitted into evidence, Biomet essentially conceded as much, stating that long-term commissions extended to both trauma and sports-medicine items. While Biomet later amended that response, jurors remained free to consider it when evaluating the parties' intent.

The trial evidence also permitted the jury to conclude that the parties never planned to exclude subsidiaries' products from the distributorship agreement. Jurors reviewed financial statements illustrating how Biomet consistently disregarded subsidiary status when calculating long-term commissions on reconstructive products. They also heard testimony from the company's former general counsel, who conceded that in his view Biomet's obligation to pay long-term commissions extended to parent and subsidiary alike.

Viewing the trial record in the light most favorable to Hess, we conclude that the evidence permitted the jury to find that the parties originally intended for the distributorship agreement to cover all categories of products that the distributors actually sold, regardless of subsidiary status. See *Thorne*,

882 F.3d at 644 (denying a motion for judgment as a matter of law where "more than a mere scintilla of evidence" supported the verdict).

Biomet urges us to at least reverse the jury's award to former distributor Frank Shera. The company emphasizes that, while settling an unrelated lawsuit, Shera conceded that his distributorship agreement did not give him the right to sell products on behalf of Biomet's subsidiaries without permission. That concession, the company contends, fatally undermines the jury's finding that Shera was entitled to long-term commissions on trauma products. Biomet reasons that because the overwhelming majority of its trauma portfolio came from a subsidiary (DePuy), Shera would not have had a right to market such products under the terms of the original distributorship agreement and instead needed to execute a new agreement before being entitled to receive any long-term commissions on their sale.

But Biomet's argument overlooks a key fact: at the point Shera signed the settlement agreement, he had already been selling trauma products on behalf of the company for over ten years. He continued to do so after settling, marketing Biomet's limited selection of trauma offerings, and nowhere does the company contend that those sales were unauthorized. We recognize that the trauma items that Shera sold represented only a fraction of those added after the DePuy acquisition. But the jury reasonably found that, because Shera sold trauma products—however few—directly on Biomet's behalf during his tenure, such products fell "within the subject distributorship" under § 9(e). Accordingly, we conclude that the trial record provided a sufficient basis for a rational jury to find that Shera's distributorship agreement entitled

him to long-term commissions on all sales of trauma products. While it would not surprise us if a different jury took the opposite view, we cannot say that the jury's finding here was so beyond the pale as to require reversal.

## IV

One final issue remains: Hess's challenge to the district court's dismissal of Counts 2 and 3. In his cross-appeal, Hess claims that the district court erred in holding that those claims had no contractual basis and were otherwise duplicative of Count 1. We disagree.

Count 2 alleged that Biomet breached the distributorship agreement by "spinning off, re-branding, substituting and otherwise discontinuing Biomet-branded products, in favor of substantially similar, if not functionally identical" Zimmer-branded products. But no provision of the agreement prohibited such conduct. So, to the extent that Hess takes issue with Biomet rebranding its product lines, it cannot be because the act of rebranding independently violated the agreement. Yet that is what Count 2 alleges—that Biomet's mere decision to rebrand breached the distributorship agreement. The district court was correct to dismiss Count 2 on that basis.

Count 3 presents a more difficult question. That count alleged that Biomet violated its contractual duty "to pay the [] Distributors commissions on all products sold by Biomet or Zimmer Biomet in the [] Distributors' former territories, regardless of whether such products are branded as Biomet, Zimmer, or Zimmer Biomet products." This allegation could be interpreted in one of two ways—either as a contention that Biomet owes long-term commissions on non-Biomet products belonging to Zimmer/Zimmer Biomet or as a claim that

Biomet used the merger as an excuse to not pay long-term commissions on what were properly considered "Biomet products." Under the first interpretation, Count 3 fails for the same reason as Count 2: no contract provision requires Biomet to pay long-term commissions on products belonging exclusively to other entities, including those marketed by Zimmer before the merger. Under the second interpretation, Count 3 is entirely duplicative of Count 1, which generally alleges that Biomet failed to pay long-term commissions on any and all "Biomet products." To the extent Biomet sought to pierce the branding veil and claim that certain items remained "Biomet products" subject to long-term commissions even after the merger, Count 1 provided a vehicle for it to do so. Indeed, all indications are that the jury embraced this theory at trial, awarding damages for unpaid long-term commissions for all trauma and sports-medicine sales made underneath the Biomet/Zimmer Biomet corporate umbrella. So the district court properly dismissed Count 3.

For these reasons, we AFFIRM the partial dismissal of Hess's complaint and AFFIRM the denials of Biomet's motions for summary judgment and judgment as a matter of law.